AO 241 (Rev. 09/17)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
2021 JUL -9 PM 4:

MITCHELL R. ELFERS
CLERK

| United States District Court | District: | Docket or Case No.: |
|---|---|---|
| Name (under which you were convicted): <br> Santana Serrano | 21cv630 JB-LF | D-506-YR-2014-00001 |
| Place of Confinement : <br> Western New Mexico Correctional Facility | Prisoner No.: <br> 83002 | |
| Petitioner (include the name under which you were convicted) <br> Santana Serrano | Respondent (authorized person having custody of petitioner) <br> v.  Jessica Vigit Richards | |
| The Attorney General of the State of: New Mexico | | |

### PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Lea County 5th Judicial District Court

    (b) Criminal docket or case number (if you know):  D-506-YR-2014-00001

2.  (a) Date of the judgment of conviction (if you know):  December 10th 2014

    (b) Date of sentencing:  March 30th 2015

3.  Length of sentence:  Life with mandatory parole

4.  In this case, were you convicted on more than one count or of more than one crime?   ☐ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

    1st degree murder

6.  (a) What was your plea? (Check one)

    ☒ (1)   Not guilty          ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty              ☐ (4)   Insanity plea

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did

you plead guilty to and what did you plead not guilty to?

_____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury    ☐ Judge only

7.   Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes    ☒ No

8.   Did you appeal from the judgment of conviction?

☐ Yes    ☐ No

9.   If you did appeal, answer the following:

(a) Name of court: New Mexico Supreme Court

(b) Docket or case number (if you know): S-1-SC-35277

(c) Result: Denied

(d) Date of result (if you know): October 27, 2017

(e) Citation to the case (if you know): _____

(f) Grounds raised: 1) In the absence of an indictment or
bind-over order the district court lacked
jurisdiction to try petitioner. 2) Appellant was
denied a fair trial when the prosecutor
superimposed statements onto the video of the
shooting it used during closing arguments

(g) Did you seek further review by a higher state court?    ☒ Yes    ☐ No

If yes, answer the following:

(1) Name of court: United States district Court District of N.M

(2) Docket or case number (if you know): _____

(3) Result: Denied

AO 241 (Rev. 09/17)

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: *Ineffective assistance of counsel*

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?  ☒ Yes  ☐ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: *Denied*

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?  ☒ Yes  ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: *Lea 5th Judicial District Court*

(2) Docket or case number (if you know): *D-506-4K-2014-00001*

(3) Date of filing (if you know): *December 10, 2019*

(4) Nature of the proceeding: _____

(5) Grounds raised: *Ineffective Assistance of Counsel*

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
☒ Yes  ☐ No

(7) Result: *Denied*

AO 241 (Rev. 09/17)

(8) Date of result (if you know): *Oct. 7, 2000*

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: *Supreme Court of New Mexico*

(2) Docket or case number (if you know): *S1-SC-38558*

(3) Date of filing (if you know): *March 5, 2021*

(4) Nature of the proceeding:

(5) Grounds raised: *Ineffective assistance of Counsel denied my State and federal constitutional rights to due process a fair trial and right against cruel and unusual punishment*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result:

(8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:    ☒ Yes    ☐ No

(2) Second petition:  ☒ Yes    ☐ No

(3) Third petition:   ☐ Yes    ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**   Inaffective Assistance of Counsel

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Did not do his duty to investigate because effective assistance must be based on investigation of options Advised me Ms Serrano against testifying because the Prosecutor would twist my words! He made an assumption no facts

(b) If you did not exhaust your state remedies on Ground One, explain why:

_____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   *Petition for Writ of Habeas Corp*

Name and location of the court where the motion or petition was filed:   *Supreme Court*

Docket or case number (if you know):   *NO, S-1-SC-38558*

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?     ☒ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☒ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☒ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   *County of Lea*

*5th Judicial District Court*

Docket or case number (if you know):   *D-506- -12-054 - 00101*

Date of the court's decision:   *03-05-21*

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _Habeas Corpus_

**GROUND TWO:** _Did not request to view supporting videos from other witnesses at the video gathering_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_Did not do his duty to investigate because effective assistance must be based on investigation of options._

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☒ Yes   ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Habeas Corpus_

Name and location of the court where the motion or petition was filed: _Lea County_
_5th Judicial District Court._

Docket or case number (if you know): _D-506-YR-2014-00001_

AO 241 (Rev. 09/17)

Date of the court's decision: _03-05-21_

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?          ☒ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Lea County_
_5th Judicial District court_

Docket or case number (if you know): _D-506-YR-2014-0000 1_

Date of the court's decision: _03-5-21_

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _Habeas Corpus_

_____

**GROUND THREE:** _Did not talk to DA in reguards of_
_filing a lesser charge of Accessory_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_Because Accessory liability is to aid in a murder_
_and that's the evidence that is provided by_
_Prosecutor_

_____

_____

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☒ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:     Habeas Corpus

Name and location of the court where the motion or petition was filed:     5th Judicial District Court, Lea County

Docket or case number (if you know):     D-506-YR-2014-00001

Date of the court's decision:     3-5-21

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?     ☒ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:     Lea County 5th Judicial District Court

Docket or case number (if you know):     D-506-YR-2014-00001

Date of the court's decision:     3-5-21

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: *Habeas Corpus*

_____

**GROUND FOUR:** Did not suppress evidence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

State and Counsel failed to present text messages from Defendant's cellphone - witness Larissa Villegas texted Defendant and indirectly, co-defendant D'Andre Gonzales, to invite them to the music video venue. Had this message been introduced into the trial, it would have been a "Meritorious" defense discrediting "intent to kill; Premeditated, delibrate"

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(Ground (A). This misconduct and Counsel's omission created fundamental unfair in the trial proceeding.

(c)     **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☒ Yes        ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d)     **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes        ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Habeas Corpus

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed: Lea County 5th Judicial District Court

Docket or case number (if you know): D-Sbb-YR-2014-00001

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?   ☒ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?   ☐ Yes   ☒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Lea County 5th Judicial District Court

Docket or case number (if you know): D-Sbb-YR-2014-00001

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: Habeas Corpus

AO 241 (Rev. 09/17)

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?   ☒ Yes      ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?      ☐ Yes      ☒ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

_____

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?      ☐ Yes      ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:   John Freelund Hobbs New Mexico

(b) At arraignment and plea:   John Freelund Hobbs New mexico

(c) At trial:   John Freelund Hobbs New mexico

(d) At sentencing:   John Freelund Hobbs New Mexico

(e) On appeal:   Stephen Aarons Santa Fe New Mexico

(f) In any post-conviction proceeding:   Jason Wheeles 276 NE 2nd St. #206 Prineville, OR 97754

(g) On appeal from any ruling against you in a post-conviction proceeding:   Jason Wheeles 276 NE 2nd St. #206 Prineville, OR 97754

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        ☐ Yes    ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?        ☐ Yes    ☐ No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

I had filed a Federal petition about a year or two ago but then asked for it to be waived without prejudice because I still had some info petition to File.

AO 241 (Rev. 09/17)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)      The time during which a properly filed application for State post-conviction or other collateral review with
respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation
under this subsection.

Therefore, petitioner asks that the Court grant the following relief: *that this Request be
Granted and either Set aside my conviction & dismiss
my case $order a new trial or vacate the sentence & Remand for*
or any other relief to which petitioner may be entitled. *a new sentencing hearing.*

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on ___07/02/21___ (month, date, year).

Executed (signed) on ___7/01/21___ (date).

*Charlie Frajo*

*Santana Serrano*
_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____

AO 241 (Rev. 09/17)

# Petition for Relief From a Conviction or Sentence
## By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1.  To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2.  You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.  Make sure the form is typed or neatly written.

4.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit any legal arguments, you must submit them in a separate memorandum. Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this petition.

6.  You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $ _____ , you must pay the filing fee.

7.  In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8.  When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

    **Clerk, United States District Court for**
    **Address**
    **City, State  Zip Code**

    If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9.  **CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

**STATE OF NEW MEXICO**
**COUNTY OF LEA**
**FIFTH JUDICIAL DISTRICT COURT**

                                    **No. D-506-YR-2014-00001**
                                    **Hon. William Shoobridge**

**SANTANA SERRANO,**
          **Petitioner,**
**vs.**

**STATE OF NEW MEXICO, and**
**LEON MARTINEZ, Warden**
          **Respondents.**

<u>**PETITIONER'S PROPOSED FINDINGS OF FACT AND LAW**</u>

COMES NOW Petitioner, Santana Serrano, through her counsel Jason B. Wheeless, and respectfully submits the following Proposed Findings of Fact and Law in support of her Amended Petition for Writ of Habeas Corpus, which was timely filed on 10 December 2019. This matter came before the court on 23 July 2020 for legal arguments and again for an evidentiary hearing on 31 August 2020. At the close of the evidentiary hearing the Court ordered the parties to produce Proposed Findings of Law and Fact. On 14 September Court staff sent an e-mail in response to a question from Petitioner's counsel clarifying that the Court wanted the proposed findings on all issues raised in the Amended Petition.

**A.**    <u>**Proposed Findings of Fact**</u> **(sources are the complete trial, district court and appellate records in the criminal case, the parties pleadings in the habeas matter, and all hearings in the habeas matter)**

1.    On the evening of May 29, 2014, several people attended the filming of a music video at The Shop in Hobbs, New Mexico.

2.    At the event Deandre Gonzales and Daniel Garcia got into a physical fight.

3.    At the end of the fight Daniel Garcia was shot once in the head and killed which ultimately led to the conviction of Ms. Serrano for first degree murder on 10 December 2014.

4.     It is undisputed that Ms. Serrano did not shoot or kill Daniel Garcia.

5.     On 25 February 2015, Ms. Serrano's boyfriend Deandre Gonzales was convicted of first degree murder for shooting and killing Daniel Garcia.  Mr. Gonzales was an adult at the time of the shooting.

7.     It was never determined what caliber bullet killed Daniel Garcia, no projectile was ever found and the weapon that fired the deadly round was never identified.

8.     A single 9 millimeter shell casing was found by police at the scene of the shooting during the investigation.

9.     Soon after the shooting law enforcement stopped a vehicle driving near the crime scene and found a .380 caliber pistol in the vehicle.

10.    At the time of the killing Ms. Serrano was 17 years of age and a juvenile under New Mexico law.

11.    Because Ms. Serrano was between 15 and 18 years of age at the time and was bound over for trial, in part, on a first degree murder charge she was a "serious youthful offender" under New Mexico law and therefore tried as an adult. See NMSA 32A-2-3(H).

12.    Ms. Serrano's case went to jury trial on 8 December 2014 wherein she was convicted of first degree murder.

13.    At trial defense counsel did not call any witnesses and did not put on a defense case.

14.    The defense, such as it was, consisted of argument by defense counsel that they should interpret the state's evidence in a way favorable to Ms. Serrano.

15.    Ms. Serrano's and Mr. Gonzales's cases were never joined for trial and Mr. Gonzales's trial was held approximately three months after Ms. Serrano's.

16.    After her 2014 arrest in the killing of Daniel Garcia, Ms. Serrano's father retained attorney John C. Fredlund to defend her.

17.     Mr. Fredlund did not review Ms. Serrano's case file prior to his testimony which affected his ability to recall much about his representation of Ms. Serrano.  Mr. Fredlund spoke to Ms. Serrano's habeas counsel by phone the week before his testimony.

18.     Mr. Fredlund "doubts" he kept any records concerning the time he spent on Ms. Serrano's case.

19.     In his career Mr. Fredlund has handled six to seven "serious youthful offender" cases, has defended several cases involving allegations of accessory liability and for 10 years had a first degree murder contract with the Law Offices of the Public Defender.

20.     Mr. Fredlund represented Ms. Serrano at the preliminary hearing in this case.

21.     At the preliminary hearing Mr. Fredlund questioned the state's witnesses but did not call any defense witnesses.

22.     Mr. Fredlund did not hire an investigator because the case did not seem that factually complicated to him, because much of it was caught on video and because it did not seem like "much digging needed to be done."

23.     Mr. Fredlund did not do any pre-trial interviews because he had questioned the witnesses the state called to testify at the preliminary hearing and because he "didn't see Santana's [Ms. Serrano's] role in this as...rises to the level the state did."

24.     Mr. Fredlund's own investigation was limited to reviewing the discovery supplied by the state.

25.     Mr. Fredlund could not remember if he made any efforts to determine if Mr. Gonzales would testify on Ms. Serrano's behalf but since he works in a small community he believes he likely spoke to Mr. Gonzales's attorney.

26.     As indicated by his affidavit attached to Ms. Serrano's Amended Petition, Mr. Gonzales would have testified for her if he had been given the chance and his testimony would have been that, in sum, Ms. Serrano did not know he was going to shoot Daniel and that she did not

want him to shoot Daniel. The Court concludes Mr. Gonzales's testimony would have been favorable to Ms. Serrano.

26.     There were 30 – 50 people at the shooting but Mr. Fredlund made no attempts to contact any of them.

27.     Mr. Fredlund could not recall how many times he met with Ms. Serrano before trial but Ms. Serrano specifically remembered she met with Mr. Fredlund three times. She testified the last meeting lasted about an hour wherein she reviewed video evidence with Mr. Fredlund.

28.     Ms. Serrano told Mr Fredlund and therefore made him aware of the following:

    a.     She and Mr. Gonzales had been invited to the filming of a video at the venue where the shooting took place through Facebook and text messages and they did not know Daniel Garcia would be at the event;

    b.     Once in the venue and just before the fight she saw Mr. Gonzales, Daniel Garcia and Ray Ortega talking among themselves;

    c.     Prior to the fight she heard David Lechuga, who had taken Daniel Garcia to the event, tell Daniel Garcia to fight Mr. Gonzales and that he was a "pussy" if he did not;

    d.     When she handed the pistol back to Mr. Gonzales after the fight she was returning his property to him and did not know he intended to shoot Daniel Garcia;

    e.     When she said, "Here it is," she was responding to Mr. Gonzales asking where the pistol was;

    f.     She was friends with and liked Daniel Garcia and did not want him to be shot and did not know that Mr. Gonzales intended to shoot him;

    g.     She knew there had been an issue between Mr. Gonzales and Daniel over a problem between Daniel Garcia's older cousin and Mr. Gonzales's older brother but believed the issue had been resolved at a carnival weeks earlier when the two had agreed to "squash" the problem;

h.      She did not know Daniel Garcia had been shot when she fled the scene of the shooting;

i.      While on the scene of the shooting she believed she heard a second gunshot and believed she saw someone besides Ms. Gonzales with a pistol;

j.      She did not know Daniel Garcia had been killed until she was arrested several hours after the shooting;

k.      The cell phone videos show her standing next to Devon Ramos just before Mr. Gonzales took his pistol back and that just before the shooting;

l.      Just before the shooting, she and Mr. Ramos were discussing getting together later in the evening;

m.      Her parents divorce had been very emotional for her and had caused her to be depressed;

n.      Deandre Gonzales had at times been abusive to her.

29.     Mr. Fredlund did not discuss with Ms. Serrano her level of education, her relationship with Daniel Garcia or whether David Lechuga and Daniel Garcia were aggressors on the night of the incident.

30.     Mr. Fredlund discussed Ms. Serrano's mental health with her father.

31.     Mr. Fredlund remembered the name Ray Ortega but could not remember from where he had heard the name.

32.     Ms. Serrano knew Mr. Gonzales carried a gun but did not know if it was loaded.

33.     Mr. Fredlund advised Ms. Serrano against testifying because the prosecutor would "twist her words."

34.     At trial, Judge Clingman explained Ms. Serrano's right to decide whether to testify at trial.

35.     Prior to trial Mr. Fredlund did not file any motions or engage in any pre-trial litigation.

36.     While in chambers the morning voir dire began, counsel made two oral objections, both of which were sustained: 1) to law enforcement testifying as to what Ms. Serrano said on a video (trial Exhibit 52) that included her interrogation by Detective Munro, and 2) the detective testifying as to his opinion on Ms. Serrano's demeanor on the video.

37.     Mr. Fredlund had stipulated to the admission of this approximately one hour and fifteen minute video (Exhibit 52) of Ms. Serrano in police custody after her arrest and made no objections to it at trial.

38.     Exhibit 52 was played in its entirety at trial and contained several segments that are relevant to Petitioner's claim of ineffective assistance of counsel:

    a.     Ms. Serrano's mother Guadalupe Serrano possibly hyperventilating;

    b.     Ms. Serrano's use of profanity to say she needed to go to the restroom;

    c.     Lengthy and emotional conversations between Ms. Serrano and her mother about whether Ms. Serrano should speak to police;

    d.     Ms. Serrano's mother emotionally and profanely tells Ms. Serrano that she needs to tell where the gun was and not to lie;

    e.     Detective Munro incorrectly states the law on accessory liability:

        i.     "If you (inaudible) before, during or after a murder, that's called an accessory, and an accessory to murder holds the same level of penalty as if you did it yourself. So when you handed him the gun and he takes it from you and immediately shoots the guy in the head [. . .] Then what happens is you are then an accessory to what happened."

        ii.     "And then you help him flee the scene by picking him up and driving him away. That shows what he did was illegal. Even if he didn't hit anybody, what he did was a crime. It's a felony, and you assisted him in after the crime and actually before hand, because if you had of taken the gun and put it in the car prior to the fight, as opposed to you, a minor

holding a loaded firearm in the middle of a fight. Now if you had anything to drink at all, then that's two crimes you've committed."

        *iii.*    "You helped him get away with this. You had the gun beforehand. Here's the thing. The fact that you, prior to me talking with you, a hundred percent simple accessory to murder, if you can provide me some information that lets me know that this is something that you weren't prepared for."

    f.    Detective Munro told Ms. Serrano, "This is not working well for you, because let me just put it this way, what happens if Deandre, who, oh, by the way, I was waiting for the phone call, he's confessing over there to his part and to your part as well."

    g.    Detective Munro opining on Ms. Serrano's demeanor during the interrogation:

        *i.*    "He [Deandre Gonzales] doesn't like the fact that he shot the guy in the head and killed him. In this room, I don't see anything from you than I don't give a shit."

        *ii.*    "Any I wish this never happened? Because the entire time you were here, the only word I can come up with is cold-hearted, like you don't care that this man dropped dead because your boyfriend shot him."

        *iii.*    ". . . I'd be chewing his [Deandre Gonzales] ass out for what happened, and all I heard was, I drop him off at his brother's house and then . . ."

    h.    Detective Munro told Ms. Serrano she was lying.

    i.    In response to Ms. Serrano stating she heard two gunshots and saw someone besides Mr. Gonzales with a gun the detective repeatedly said it was an echo.

39.    At trial, Detective Munro testified he believed it was an echo because when a generator fell to the ground while he was at the crime scene it caused an echo.  There is no evidence law enforcement ever conducted any echo tests or confirmed that what Ms. Serrano and other witnesses claimed was a second gunshot was really an echo.

40.    Defense counsel did not challenge the detective's echo theory on cross examination.

41.     Exhibit 52, admitted by stipulation of the parties, contained much of the material that was covered by Mr. Fredlund's in limine objections which were sustained.

42.     Mr. Fredlund stipulated to the video because he thought it would allow him to get Ms. Serrano's version of events to the jury and because he thought it would bolster her credibility by showing she was not acting on her own and was being manipulated by Mr. Gonzales.

43.     In Mr. Fredlund's cross examination of Det. Munro he made no attempt to clarify the actual legal standard for accessory liability.

44.     Mr. Fredlund testified he did not do so because he did not believe the judge would allow him to argue the law with a police officer; however, on cross-examination he asked a confusing line of questions about the detective's opinion on the difference between accessory after the fact and harboring a felon and argued with the detective about his answers.

45.     Mr. Fredlund testified that he is aware that New Mexico law no longer recognizes a distinction between accessory before and accessory after the fact.

46.     On opening argument Mr. Fredlund stated the following relevant to Ms. Serrano's inaffective assistance of counsel claim:

a.      "[O]ne thing I think we both agree on is that the death, the killing, the murder of Daniel Garcia was a horrible and senseless crime."

b.      The relationship between Ms. Serrano and Mr. Gonzales was not approved of by Ms. Serrano's parents.

c.      "Deandre had a problem with Daniel's cousin, a beef about something that's really not important. It certainly did not justify or warrant anything that occurred to Daniel that night . . ."

d.      "Santana took the gun away from him. She didn't want anything like this to happen. She took the gun to avoid the violence from escalating to the point of this type of force, deadly force."

e.      "We are not condoning Santana's conduct that night . . ."

f.      ". . . we believe that you will understand that Santana is not the one guilty of first degree murder. The person who's guilty of first degree murder awaits trial, Mr. Gonzales . . ."

47.     Mr. Fredlund stated both that he did not know why he conceded that a murder had occurred and that he did so because it seemed obvious that a murder had occurred.

48.     When asked to reconcile his argument that he did not condone Ms. Serrano's conduct and that she only took the gun from Mr. Gonzales to avoid more violence, Mr. Fredlund stated that he could not remember his thinking at the time he made the statements.

49.     Mr. Fredlund acknowledged that conceding a murder had occurred was a "miscalculation."

50.     Mr. Fredlund's comment about the problem between Mr. Gonzales and Daniel Garcia not justifying the shooting was meant to lay the entire crime at Mr. Gonzales's feet.

51.     The autopsy report prepared by Dr. Flores of Lubbock, Texas, showed Daniel Garcia had both ethanol and THC (the intoxicating metabolite in marijuana).

52.     At trial defense counsel stipulated to admission of the autopsy report's admission into evidence without requiring its author to lay a foundation for its authenticity and so was unable to cross-examine the author about the finding of intoxicants in the decedent's system.

53.     Mr. Fredlund feels that in retrospect this might have been a mistake but he also believed the jury would understand the report.

54.     Mr. Fredlund did a brief cross-examination of David Lechuga about his use of beer and marijuana on the night of the shooting.

55.     Mr. Fredlund felt the intoxicants were relevant to how things spiraled out of control but not relevant to Ms. Serrano's specific conduct.

56.     The autopsy photos were admitted without objection through the testimony of Ofc. Jeremy Grady of the Hobbs Police Department.  Ofc. Grady testified about the contents of the photos and the nature of the decedent's injuries without objection from Mr. Fredlund.

57.     Mr. Fredund did not object because of discussions he had with the prosecutor about streamlining the process and he did not see any value in arguing about it.

58.     The two cell phone videos (Exhibits 53 & 54) of the fight and the shooting were admitted into evidence by witnesses who were not at the scene of the fight and shooting and without objection by defense counsel:

     a.     Exhibit 53 was admitted through the testimony of Officer Arnulfo Reyes who obtained the video from the person who made it.

     b.     Exhibit 54 was admitted through the testimony of Tracey Brockman, the mother of the boy who had taken the video.

59.     The videos show a crowd of people standing excitedly by as Deandre Gonzales hands Ms. Serrano his shirt, hat and pistol just before he and Daniel Garcia fight.  One of Mr. Garcia's friends is standing next to him and encouraging him to fight.  There is a brief fist-fight that ends with Mr. Garcia punching Mr. Gonzales to the ground.  While the fight is happening Ms. Serrano is holding the pistol while standing almost in the middle of the fight. While Mr. Gonzales was on the ground David Romero intervened and broke up the fight.  Mr. Gonzales then stood up, walked towards Ms. Serrano with his hands out.  Ms. Serrano looked towards him and stated, "Here it is," while holding the pistol towards Mr. Gonzales.  Mr. Gonzales takes the weapon, turns towards Mr. Garcia and fires a single shot.  The video does not show the bullet's impact. The videos show the entire fight and shooting all occurred in a matter of seconds.

60.     Defense counsel did not object to admission of the videos because he believed they would be admitted anyway, it streamlined the process and it avoided testimony of other bad facts.

61.     The only motion for directed verdict made by Mr. Fredlund was on accessory liability and it was denied.

62.     Relevant to the Petition, Mr. Fredlund said the following during closing arguments:

        a.      "I'm very concerned for my client because the video is very compelling but I would suggest to you and I'd ask that you consider the fact that the video is what it is."

        b.      "Ms. Serrano is being charged as an accomplice to first degree murder . . ."

        c.      Ms. Serrano went to The Shop often but Daniel Garcia not so often.

        d.      The problem between Mr. Gonzales and Daniel Garcia was "petty" and "not worth anybody getting killed."

        e.      Ms. Serrano's family did not approve of her relationship with Mr. Gonzales.

        f.      Mr. Gonzales shot because he was embarrassed at having lost a fight.

        g.      "[J]ury instructions require that you find as to this first degree murder that Santana intended that the crime be committed."

        h.      "[O]f the crimes that you've been charged with, I'd like to point out to you the involuntary manslaughter instruction. That provides that Santana negligently handled a firearm. . . I'd suggest to you that, of the crimes that you've been charged with is the one that possibly fits. It doesn't dovetail. It's not a perfect match."

63.     The jury was given the standard, unaltered jury instructions relevant to her case. Instructions relevant to her Petition are accessory liability (UJI 14-2822), first degree murder (UJI 14-201), second degree murder (UJI 14-210), voluntary manslaughter (UJI 14-220), and

 involuntary manslaughter (UJI 14-231).

64.    Neither the accessory instruction nor the word accessory was incorporated into any of the four homicide instructions.  The accessory instruction and the four homicide instructions make no reference to each other and were given separately and printed on separate sheets of paper.

65.    The accessory instruction states, in relevant part, "The defendant may be found guilty of the crime even though she herself did not do the acts constituting the crime…".  UJI 14-2822.

66.    Three of the homicide instructions (UJI's 14-201, 14-210, 14-220) state that for the jury to find the defendant guilty they must, in part, find "The defendant killed Daniel Garcia."  To find Ms. Serrano guilty of involuntary manslaughter the instruction (UJI 14-231) requires the jury to find that the defendant "negligently handled a firearm" and that her "act caused the death of Daniel Garcia."

67.    Mr. Fredlund did not object to the jury instructions.

68.    The jury returned a general verdict form that did not indicate whether they believed Ms. Serrano was guilty of first degree murder as an accessory or if they concluded she actually did kill Daniel Garcia.

69.    Mr. Fredlund did not ask the judge to poll the jury because it would have been "15 minutes of pain" and he generally does not poll juries.

70.    A two page pre-sentence report about Ms. Serrano was produced by the Corrections Department before the sentencing.

71.    The pre-sentence report is very brief and does not contain the sort of information that would be helpful to a sentencing judge or that is even required by Corrections Department policies.

72.    Mr. Fredlund did not object to the pre-sentence report.

73.    The sentencing hearing lasted 19 minutes.

74.     At the sentencing hearing Mr. Fredlund did not advocate for a specific sentence, only that the judge "suspend some portion" of the sentence.

75.     Mr. Fredlund presented no evidence at the sentencing hearing.

76.     Prior to sentencing Mr. Fredlund did not have Ms. Serrano evaluated by a psychologist or psychiatrist.

77.     The only presentation made by Mr. Fredlund was Ms. Serrano apologizing and Ms. Serrano's mother asking for leniency.

78.     In announcing a life sentence with parole Judge Clingman told Santana that she alone could have prevented Daniel's death.

79.     Mr. Fredlund did not do more to present a mitigating case at sentencing because his familiarity with Judge Clingman led him to believe he picked up on "mannerisms" and "things of that nature" from the judge and "sensed" that the judge did not necessarily believe Ms. Serrano was as responsible as Mr. Gonzales.

80.     Mr. Fredlund also stated that when the judge hurried him along in closing arguments he believed the judge was indicating an opinion on how the state's case was going.

81.     Attorney Stephen Taylor, formerly with the Law Offices of the Public Defender in Albuquerque and now with the Federal Public Defender in Albuquerque, has represented several youthful offenders charged as adults and trains other attorneys in proper mitigation at sentencing in those cases. Mr. Taylor supplied an affidavit attached to the Amended Petition stating his credentials, providing sample sentencing memoranda, a judge's bench card on sentencing youths as adults and what is required of an attorney in such a case. Mr. Taylor's affidavit describes the prevailing professional standards for defense counsel in sentencing mitigation in cases such as Ms. Serrano's.

82.     Mr. Fredlund has not read the case Miller v. Alabama, 367 U.S. 460, (2012).

83.     Prior to the sentencing hearing counsel filed no sentencing memorandum.

84.     On 4 November 2016 (approximately 18 months after the sentencing hearing), Mr. Fredlund filed a Motion for Downward Modification of Sentence wherein he noted that the children's code allowed the court to sentence a serious youthful offender to less than the mandatory sentence an adult convicted of the same crime would be ordered to serve and that the children's code "was drafted with the recognition that juvenile minds and decision making abilities are not as developed as adults."

85.     The Motion demonstrates Mr. Fredlund understood the relevance of youth and youth brain development to the law when sentencing youths for the most serious crimes.

86.     Mr. Fredlund did not have Ms. Serrano evaluated because he had the "impression" the judge would suspend some of the sentence.

87.     Mr. Fredlund described his overall case strategy as wanting to show Ms. Serrano as being under the influence of an overbearing boyfriend who had done her best to avoid a tragedy by taking the gun from him.

88.     Mr. Fredlund believed the interrogation video (Exhibit 54) was adequate to explain Ms. Serrano's version of events.

89.     At the time of trial Mr. Fredlund believed the state's case would demonstrate his theory and that he did not need to put on any additional information.

90.     Mr. Fredlund expressed regrets over how he handled the case and described his approach as "overconfident".

91.     His overconfidence affected his performance "in terms of just believing from the outset that this was to be presented through the state's witnesses and would be seen by a jury as I saw it. Obviously that was a mistake."

**B.    Proposed Findings of Law**

**Ineffective assistance of counsel:**

1.      Inaffective assistance of counsel claims present mixed questions of law and fact. Strickland v. Washington, 466 U.S. 668, 698 (1984).

2.      The overarching test for effective assistance of counsel claims is whether defense counsel subjected the prosecution's case to meaningful adversarial testing. Strickland, 466 U.S. at 686.

3.      Effective assistance of counsel is necessary to safeguard the right to a fair trial. U.S. v. Cronic, 466 U.S. 648, 654 n. 8.

4.      A claim of ineffective assistance of counsel has two components: first, the petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and, second, must show that the deficiencies prejudiced the defense. Strickland, 466 U.S. at 687.

5.      Courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and avoid judging counsel's performance based on hindsight.   Strickland, 466 U.S. at 687.  Counsel's conduct should be evaluated from counsel's perspective at the time. Id. at 689. There is a presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" Id.

6.      However, "the mere incantation of strategy does not insulate attorney behavior from review." Brecheen v. Reynolds, 41 F.3d 1343, 1369 (10th Cir. 1994).

7.      The proper measure of attorney performance is reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688.

8.      Prejudice requires a defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is one that undermines confidence in the outcome." Strickland, 466 U.S. at 694. "[T]he

question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."

9.      In the prejudice inquiry the focus should be on whether the result of the trial was fundamentally unfair or unreliable. Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

10.     Petitioner must show prejudice by less than a preponderance of the evidence and a showing of innocence is not required. Fisher v. Gibson, 282 F.3d 1283, 1307 (10th Cir. 2002).

11.     As relevant to this Petition, counsel has a duty of loyalty, duty to investigate and a duty to advocate for his client.  See Fisher v. Gibson, 282 F.3d 1283.

12.     "[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about bow best to represent his client." Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) citing Strickland, 466 U.S. at 689.

13.     "[A] failure to investigate, especially as to key evidence, must be supported by a reasonable and deliberate determination that investigation was not warranted." O'hara v. Wiggington, 24 F.3d 823, 828 (6th Cir. 1994).

14.     A decision not to investigate cannot be deemed reasonable if it is uninformed. Fisher v. Gibson, 282 F.3d at 1296.

15.     "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'..." Strickland, 466 U.S. at 691.

16.     "Duty to present mitigating evidence . . . is not independent of the duty to investigate and prepare." Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991).

17.     "Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of the trial." Battenfield v. Gibson, 235F.3d 1215, 1226 (10th Cir. 2001).

18.     Counsel in Ms. Serrano's case provided constitutionally deficient representation by violating his duty to investigate, his duty of loyalty and to advocate.

19.     Trial counsel did no investigation at any stage in his representation of Ms. Serrano.

20.     Counsel's stated reasons for not investigating fall below an objective standard of reasonableness, cannot be considered strategic and rendered him unprepared and ineffectual at trial and even harmful to his client's defense. (The Third Circuit has held that "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice when s/he [sic] has not yet obtained the facts on which such a decision could be made." See U.S. v. Gray, 878 F.2d 702, 711 (3d Cir.1989). A lawyer has a duty to "investigate what information ... potential eye-witnesses possess[ ], even if he later decide[s] not to put them on the stand." Id. at 712. See also Hoots v. Allsbrook, 785 F.2d 1214, 1220 (4th Cir.1986) ("Neglect even to interview available witnesses to a crime simply cannot be ascribed to trial strategy and tactics."); Birt v. Montgomery, 709 F.2d 690, 701 (7th Cir.1983), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984) ("Essential to effective representation ... is the independent duty to investigate and prepare.").

21.     Counsel stated he did not conduct pre-trial interviews with any witness because he had questioned some of the state's witnesses at the preliminary hearing.  Conducting a preliminary hearing may inform an investigation and perform some investigative functions but in a first degree murder case, and many others, it is not a substitute for an investigation or pre-trial interviews.  To begin with, the rules of evidence apply in a preliminary hearing thus narrowing the scope of any questioning in that venue.  This limitation does not exist in pre-trial interviews.  Furthermore, the information that can be gathered at a preliminary hearing is limited by the prosecution's choice of witnesses and their level of relevant knowledge.  It goes without saying that the prosecution would generally not call witnesses favorable to the

defense. Limiting an investigation to a preliminary hearing allows the prosecution and the rules of evidence to set the parameters of the defense investigation and insulates defense counsel from learning what he does not know.

22.     Evidence at trial showed there were 30 – 50 witnesses to the shooting. Video of the shooting showed Ms. Serrano standing next to and talking to Devon Ramos just before the shooting.  Ms. Serrano told counsel that she was talking to Mr. Ramos about hanging out later in the night. Counsel should have tried to locate Mr. Ramos to determine if he had information relevant to Ms. Serrano's mental state at the time of the shooting.

23.     Ms. Serrano told the detective she heard a second shot and saw a person with a gun which caused her to flee the scene.  The prosecution argued that fleeing was evidence of her guilt. Other witnesses told law enforcement they heard a second shot. Detective Munro told Ms. Serrano that the second shot was an echo leaving her looking dishonest in her claim of seeing a second person with a gun. Police stopped a suspicious vehicle near the scene after the shooting and discovered a pistol in it.  A second gunshot or someone else present with a gun might have been relevant to possible self defense, defense of others or adequate provocation defense or at a minimum to give context to Ms. Serrano's post-shooting behavior.

24.     Ms. Serrano told counsel about the initial encounter between Mr. Gonzales and Daniel Garcia.  She told him and the detective that Daniel Garcia was aggressive, that David Lechuga encouraged the fight and that Ray Ortega witnessed all of this.  David Romero Sr. testified at trial that he had told Daniel not to fight, that Daniel had agreed and then fought anyway.  This evidence is relevant to Ms. Serrano's mental state since under an accessory theory the state had to prove she shared Mr. Gonzales's mental state or had the mental state of the crime of conviction. This was relevant not just to the accessory theory but also to the distinction between first and second degree murder and second degree murder and voluntary manslaughter. Counsel made no efforts to determine any of this.

23.     Ms. Serrano told counsel she believed the problem between Mr. Gonzales and Daniel Garcia was resolved weeks earlier at a carnival.  This is relevant to the deliberate intent element of first degree murder.

24.     Counsel made not attempts to investigate the effects of alcohol and THC on a person's behavior.  This again is relevant to several defenses if it were shown that Daniel Garcia were under the influence of intoxicants.  The videos of the incident show he and David Lechuga to be very aggressive and excited to fight.

25.     Counsel was made aware of several lines of defense by Ms. Serrano and the discovery and he investigated none of them making his claimed strategy uninformed and unreasonable.

26.     In fact, Mr. Fredlund's stated strategy of believing the jury would view the state's evidence as showing Ms. Serrano as a "girlfriend in tow" and as exculpatory is no strategy at all.  It relies on assumptions and hope about how the jury would perceive the state's case.  In the context of a case the interrogation video containing so many prejudicial moments, the claimed strategy was little more than a gamble with incalculable odds.  Since this claimed strategy was not based on an investigation or any effort to learn more about the events of the disputed night it was unreasonable.

27.     Counsel's failure to investigate rendered him unprepared for trial as is evidenced by his many meandering cross-examinations comprised mainly of open ended questions.  See Fisher v. Gibson, 282 F.3d 1283, 1294, 1299 (Counsel's "cross examination served solely to allow prosecution witnesses to reiterate the state's evidence, and did not challenge the testimony or the witnesses' credibility in any way" and revealed that "he had no idea what answers he would receive . . . and was not pursuing any particular strategy of defense).

28.     Counsel's strategy at trial of allowing the state's evidence to speak for Ms. Serrano was unreasonable and violated his duty of loyalty to Ms. Serrano and his duty to advocate for her and was simply inept.  It also means he chose not to present a defense case and to rely on

solely argument about what the jury had seen in the videos, evidence the prosecution put before the jury because it believed it showed the exact opposite. There was no evidence explaining Ms. Serrano's behavior in any of the videos admitted into evidence at trial.

29.     Although counsel claimed he believed the video was adequate to present Ms. Serrano's defense his statement on closing that he was worried because the video is very compelling contradicts this and is tantamount to an admission that he had failed to even develop any way to communicate Ms. Serrano's position to the jury.

30.     The stipulation to the interrogation video (Exhibit 52) is especially puzzling since it contained much of the evidence counsel had successfully excluded in limine. Counsel had successfully kept the detective from testifying about his opinion of Ms. Serrano's demeanor during the interrogation and then stipulated to the video that shows him doing just that.

31.     The interrogation video was highly prejudicial to the defense. Much in the video was hearsay, irrelevant and unduly prejudicial under the 11-403 balancing test. Both Ms. Serrano's mother and the detective cast doubt on her truthfulness, the detective repeatedly and angrily claimed Ms. Serrano was unconcerned with Daniel's death, the detective claimed Mr. Gonzales had confessed Ms. Serrano's role in the killing and the detective repeatedly misstated the standard for accessory liability and stated Ms. Serrano was guilty of accessory to murder possibly misleading and confusing the jury.

32.     Counsel's stipulation to the autopsy report and failure to consult an expert means he had no one to question about the alcohol and THC in Daniel's system the night Daniel died and what effects it may have had on his behavior. See Fisher v. Gibson, 282 F.3d at 1295 (Counsel also "failed to pursue results of state tests on the clothing that might have established the bloodstains did not match the victim's blood . . .).

33.     Counsel recklessly conceded on both opening and closing arguments that a first degree murder had occurred despite the jury being instructed on all four levels of homicide. Counsel

stated he did so because it was obvious that is what happened. This is inept and went directly against his client's interests because one of the things the state needed to prove under an accessory theory is what crime was committed. There were strong arguments and evidence to be developed that while the shooting may have been intentional it was not deliberate or that it was done only after adequate provocation. Conceding the highest crime the state was trying to prove made the state's job of proving its case much easier and gained his client nothing. See Fisher v. Gibson, 282 F.3d at 1296 (Where an attorney accidentally brings out testimony that is damaging because he has failed to prepare, his conduct cannot be called a strategic choice: an event produced by the happenstance of counsel's uninformed and reckless cross-examination cannot be called a choice at all.").

32.     Since Ms. Serrano was a serious youthful offender it was critical that counsel try to develop evidence that this was not a first degree murder. Had Ms. Serrano been convicted of anything less than first degree murder she would have been a youthful offender with the possibility of being sentenced as a juvenile. See State v. Jones, 2010-NMSC-012.

33.     Counsel could not reconcile his statements on opening and closing arguments that Ms. Serrano had done the right thing in taking the gun from Deandre with his statement that he did not condone her behavior. These statements in tandem communicate a conflicting message, are confusing and may have even hurt counsel's credibility with the jury by making him look confused and ill-prepared.

34.     Counsel made no motion for directed verdict on first degree murder; his cross-examination of Det. Munro about the difference between accessory after the fact and harboring a felon was nonsensical and incorrect on the law; his cross-examination of David Lechuga did not challenge any of his actions; and his stipulation to admission of the autopsy photos means he had no one to cross examine about its contents.

35.     And under the circumstances of the case, his advice to Ms. Serrano not to testify was unreasonable.  Its reasonable to assume that a 17 year old with no experience in trial practice would defer to the counsel of her attorney. With no other witnesses or evidence there was no way to get her side of the story before jurors or to explain her seeming dishonesty in the video. Counsel's belief that the prosecution would twist Ms. Serrano's words if she testified is at best naive since the prosecution already had her words from the videos to use against her.  Without testifying she had no way to explain herself and her words on the videos to the jury.  Gone unexplained her words are not necessarily exculpatory and were used to great effect against her by the prosecution.

36.     The ineptitude and lack of preparation shown by the above incidents and throughout the trial indicate an objectively unreasonable failure to investigate and prepare and to advocate for the his client.

37.     The lack of investigation into mitigation at sentencing was also unreasonable and the motion to reduce sentence filed by Mr. Fredlund in November 2016 wherein he argued her youth and brain development were relevant to sentencing serious youthful offenders indicates he knew this.  Counsel's belief that he read in the judge's demeanor that he would suspend a portion of the 30 year sentence is not credible.

38.     As held in Miller v. Alabama, supra, and Mr. Taylor's affidavit attached to Ms. Serrano's petition, the 8th Amendment demands that attorneys representing juveniles convicted as adults of the most serious crimes have their client evaluated and to present mitigating evidence of their youth and brain development at sentencing consistent with the Miller factors.

39.     But even if Miller did not mandate mitigation in cases such as Ms. Serrano's, defense counsel still has an obligation to investigate mitigation for sentencing. See Battenfield v.

Gibson, supra.  Mr. Fredlund essentially gave the judge no reason why he should not sentence Ms. Serrano to the maximum allowed.

40.     Counsel's claimed knowledge of Judge Clingman's feelings about sentencing at the trial four months before the sentencing hearing is not a valid strategy and is not a substitute for investigation, preparation and advocacy.

41.     Ms. Serrano's case was prejudiced by Mr. Fredlund's deficiencies.  Counsel's lack of preparation and failure to subject the state's case to any adversarial testing produced a result that is fundamentally unfair and unreliable.  The only time the jury heard Ms. Serrano's version of events was through the highly prejudicial interrogation video which left her with no opportunity to explain what she said in the video, which was central to the state's successful prosecution of her.

42.     It is obvious Ms. Serrano did not shoot and kill Daniel Garcia. The state's case against Ms. Serrano consisted of the video of her handing the pistol to Mr. Gonzales and her statement "Here it is," as she handed it to him and her fleeing the scene combined with her statements to the detective.  The state relied on circumstantial evidence to prove her mental state.  Since Ms. Serrano was not the shooter and was giving back to Mr. Gonzales his own pistol he had moments before given her, the state's case was not particularly strong which made counsel's errors even more prejudicial. See Fisher v. Gibson, 282 F.3d at 1308 (The nature of this case made counsel's errors prejudicial. The prosecution's case against Mr. Fisher was not overwhelming).

42.     Had Ms. Serrano testified consistent with her testimony at the August 31, 2020, evidentiary hearing and had any juror believed her, there would have been a reasonable doubt. The same goes for Mr. Gonzales if he had testified consistent with his affidavit.

43.     The trial record and Mr. Fredlund's testimony at the evidentiary hearing indicate a lack of any coherent defense strategy and an attorney so unprepared that he stipulated to highly damaging state's evidence and unwittingly hurt his client's case.

44.     That representation as outlined in the individual instances above, or taken as a whole, was deficient and it prejudiced Ms. Serrano's case to an extent it cannot be said that she received a constitutionally fair trial.

45.     Counsel failed to learn basic facts or follow up on things he knew that would have made for a strong mitigating case, would have educated the judge on current legal trends in sentencing juveniles as adults and led to a lesser sentence and to Ms. Serrano's unique factors.

**The Sentencing Hearing**

1.     Other than Ms. Serrano apologizing and her mother stating Ms. Serrano was a good kid, counsel presented no mitigating case at sentencing.

2.     Counsel made no attempt to discovery mitigating evidence.

3.     The consequences of trial counsel's failure to mitigate were demonstrated when the court assigned her complete blame for the killing, "[A]lthough you didn't actually fire the shot and pull the trigger you were in control of the whole situation. You had the gun. You had the, you alone had the ability to keep this from happening, and you didn't." See Graham v. Florida, 560 U.S 48, 69 ("...when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.).

4.     The Eighth Amendment's right not to be subjected to excessive sanctions "flows from the basic precept of justice that punishment for a crime should be graduated and proportioned to both the offender and the offense." Miller v. Alabama, 567 U.S. 460, 469 (2012)(internal citations omitted).  An offender's age is relevant to the Eighth Amendment. Id. at 473. "[I]mposition of a State's most severe penalties on juvenile offender's cannot proceed as though

they were not children." Id.  Because juveniles have diminished capacity, "they are less deserving of the most severe punishments." Id. at 471, quoting Graham, 560 U.S. at 68.

5.      The "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders even when they commit terrible crimes." Miller, 567 U.S. at 472.

6.      "So Graham  and Roper and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." Miller, 567 U.S. at 477.

7.      The Miller Court summarized the "gaps" between adults and juveniles as shown by the scientific research and that the Supreme Court has found relevant and necessary in fashioning juvenile sentences that are proportional for 8th Amendment purposes: 1) children have a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk taking; 2) children are more vulnerable to negative influences and pressures including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime producing settings; and, 3) a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity. Miller, 567 U.S. at 471, see also Ira v. Janecka, 419 P.3d 161 (N.M., 2018)(summarizing the Miller factors).

8.      Miller reasoned that "transient rashness, proclivity for risk, and inability to assess consequences-both lessened a child's moral culpability and enhanced the prospect that, as years go by and neurological development occurs his deficiencies will be reformed. Miller, 567 U.S. at 472, quoting Roper v. Simmons, 543 U.S. 551, 570 (2005).

9.      While the court was not forbidden from giving a sentence of life with parole, it should only have done so after considering evidence of the unique circumstances of the juvenile offender and the circumstances of the crime. See State v. Gutierrez, No. 33,354 (N.M., 2013)(memorandum

opinion, see Rule 12-405) citing <u>Miller</u>, supra ("Since life with the possibility of parole is a lesser sentence [than life without parole], and the district court considered the unique circumstances of the case, the Child's sentence does not transgress the constitutional standard.")

10.    Mr. Taylor's affidavit and its accompanying documents demonstrate the same conclusion.

11.    Counsel developed no mitigation evidence relevant to the <u>Miller</u> factors and the sentencing court consider none since not even the pre-sentence report contained any of the information <u>Miller</u> holds relevant.

12.    Pursuant to NMSA 31-18-15.3 a pre-sentence report of approximately one and one half pages was produced and it contained almost no information relevant to sentencing.

13.    As Petitioner's counsel showed in his Amended Petition, the pre-sentence report did not even contain the information required by Corrections Department policies.  Because of the length and number of those policies they will be incorporated here fully by reference to the Amended Petition for Writ of Habeas Corpus filed on 10 December 2019.

14.    The court finds that the pre-sentence report in Ms. Serrano's case is not a pre-sentence report under 31-18-15.3 because it supplies almost no information relevant to sentencing and does not even satisfy the Corrections Departments own policies on the content or pre-sentence reports.  It is notable that Judge Clingman did not refer to its contents during sentencing.  It is a pre-sentence report in name only.

15.    "[A] trial court has no jurisdiction to impose a sentence accept in accordance with the law..." <u>State v. Mares</u>, 119 N.M. 48, 50 (1994). Preparation of and submission of a presentence report is is a mandatory precedent to a child's sentencing as a serious youthful offender. <u>State v. Gutierrez</u>, 2011-NMSC-024, ¶ 66.

16.    The sentencing hearing did not comply with New Mexico statutory law and therefore violated Ms Serrano's Constitutional due process of law.

17.     Because of the statutory and 8th Amendment deficiencies in the sentencing procedure, Ms Serrano is entitled to a new sentencing hearing. Her counsel should conduct an appropriate mitigation investigation and provide the appropriate evidence to the court and the Corrections Department should provide a legally sufficient pre-sentence report. In sum, the sentencing hearing was not lawful or constitutional.

## Jury Instructions

1.     The accessory instruction (UJI 14-2822) and the homicide instructions are inherently contradictory and confusing. The accessory instruction, states, in relevant part, "The defendant may be found guilty of a crime even though he himself *did not do the acts* constituting the crime". (emphasis added). The instructions for First Degree Murder (UJI 14-201) Second Degree Murder (UJI 14-210), Voluntary Manslaughter (UJI 14-220) and Involuntary Manslaughter (UJI 14-231) all require that to find the defendant guilty the jury must find that the defendant killed or, as is the case with voluntary manslaughter, caused the death of the victim. There is an explicit conflict between the plain language of the accessory instruction and the instructions for the four levels of homicide as given to Ms Serrano's jury.

2.     Trial counsel did not object to the jury instructions and the issue was not raised on appeal.

3.     The fundamental error doctrine stands as "[a]n exception to the general rule barring review of questions not properly preserved below[.]" State v. Osborne, 1991-NMSC-032, ¶ 38 internal quotation marks and citation omitted).

4.     "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." State v. Sutphin, 2007-NMSC-045, ¶ 16.

5.     When reviewing a jury instruction for unpreserved, fundamental error, the Court begins with the same inquiry as for preserved, reversible error: "whether a reasonable juror would have been confused or misdirected by the jury instruction." See Barber,2004-NMSC at ¶ 19. If the

answer is yes, "[f]undamental-error analysis then requires a higher level of scrutiny." Id. "If we find error, our obligation is to review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." Id."[F]ailure to instruct the jury on an essential element, as opposed to a definition, ordinarily is fundamental error when the defendant fails to object or offer a curative instruction."Id. At ¶ 20.

6.      Since the state was proceeding on an accessory theory the jury instructions for the actual crimes should have incorporated the accessory language in order to direct the jury to the what the law required when assessing the evidence in light of the reasonable doubt standard.  As it was given, without reference to any specific crime, the bare accessory instruction is misleading about the mens rea elements of the substantive crimes and could have led them to convict on an accessory theory because they believed the defendant intended some or any crime to occur since the instruction is not explicitly linked to any specific crime. Or, it may have led the jury to decide that if it believed Ms. Serrano was an accessory they could ignore the mens rea requirement of the substantive crime before convicting her of one of them. Or, since the substantive instructions do not reference the accessory instruction, the jury may have found, despite no evidence, that the defendant actually did the killing. See Jackson v. Virginia, 443 U.S. 307 (1979)(Noting that even "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.") That is entirely possible since the instructions for the substantive crimes instructed the jury to consider just that and they rendered a general verdict.  The jury cannot be expected to ignore the plain meaning of the words they are told to faithfully follow.  Its as if the instructions created an entirely separate crime of accessory unrelated to the other crimes they were instructed to consider.

7.      The defendant in State v. Varela, 1999-NMSC-45, made a somewhat similar argument.  In that case the jury was instructed on accessory, felony murder and depraved mind murder which

incorporated the accessory language of "The defendant ... helped, encouraged or caused.", and Second Degree Murder which did not contain the helped, encouraged or caused language. Id. at ¶ 44. The defendant argued that omitting that language from the second degree instruction may have led the jury to believe there was a higher level of culpability for felony or depraved mind murder than for second degree. Id. The Court disagreed because the second degree instruction stated, "For you to find defendant guilty *as an accessory* to Second Degree Murder as an included offense of Count 1, *even though the defendant did not commit the murder...*" and the jury was given the accessory instruction separately. Id.

8.      There was no such language included in the instructions for the substantive crimes in this case and those instructions in no way referenced the accessory instruction or directed the jury to read them together or explained that accessory is not a separate crime, in and of itself.   Because of the ambiguous and contradictory language of the jury instructions, it cannot be said that the jury was adequately instructed on the law of the case or that the jury ignored the plain language of the instructions before them.

**C.      Conclusion**

Wherefore, Ms. Serrano respectfully requests the Court adopt the above proposed findings of fact and law, grant her Amended Petition for Writ of Habeas Corpus and order a new trial or, at a minimum, order a new sentencing hearing be held.

Respectfully submitted,

_____/s/ JW electronically_____
Jason B. Wheeless, Esq.
Attorney for Petitioner
276 NE 2nd St. #206
Prineville, OR 97754
(505) 261-2230, jbwlaw505@gmail.com

I hereby certify that a true and correct copy of the
foregoing was sent to Counsel for Respondent upon filing.

*Jason Wheeless*

_____

Jason B. Wheeless, Esq.

Supreme Court of New Mexic
3/5/2021 9:07 A
Office of the Cle

Joey D. Moya

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**
**March 05, 2021**

NO. S-1-SC-38558

**SANTANA SERRANO,**

Petitioner,

v.

**STATE OF NEW MEXICO and**
**LEON MARTINEZ, Warden,**

Respondents.

**ORDER**

WHEREAS, this matter came on for consideration by the Court upon petition for writ of certiorari and response filed under Rule 12-501 NMRA, and the Court having considered the foregoing and being sufficiently advised, Justice Barbara J. Vigil, Justice C. Shannon Bacon and Justice David K. Thomson concurring;

NOW, THEREFORE, IT IS ORDERED that the petition for writ of certiorari is DENIED.

IT IS SO ORDERED.



WITNESS, the Honorable Michael E. Vigil, Chief Justice of the Supreme Court of the State of New Mexico, and the seal of said Court this 5th day of March, 2021.

Joey D. Moya, Clerk of Court
Supreme Court of New Mexico

By _Madeline Garcia_
Chief Deputy Clerk

**I CERTIFY AND ATTEST:**
A true copy was served on all parties
or their counsel of record on date filed.
_Madeline Garcia_
Clerk of the Supreme Court
of the State of New Mexico

FILED
5th JUDICIAL DISTRICT COURT
Lea County
10/7/2020 2:06 PM
NELDA CUELLAR
CLERK OF THE COURT
Jennifer Salcido

**FIFTH JUDICIAL DISTRICT COURT**
**COUNTY OF LEA**
**STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**
        **Plaintiff,**

**vs.**

                                        **No. D-506-YR2014-1**

**SANTANA SERRANO,**
        **Defendant.**

## ORDER DENYING PETITION FOR HABEAS CORPUS

**THIS MATTER** came on for hearing on August 31, 2020, the Court having reviewed the pleadings, the videos admitted into evidence, requested findings and heard arguments of counsel, finds:

    1. During trial proceedings, Petitioner, a juvenile was represented by attorney Jon Fredlund on the charge of First Degree Murder. Mr. Fredlund is an experienced attorney who has represented numerous individuals charged with homicide to a jury verdict, has handled six to seven "serious youthful offender" cases, has defended several cases involving accessory liability and for ten years had a first degree murder contract with the Law Offices of the Public Defender.

    2. Petitioner, who was 17 years of age at the time of the homicide, was bound over for trial as a "serious youthful offender" on a first degree murder charge and was tried as an adult.

    3. The evidence at trial established that Petitioner, along with her boyfriend, DeAndre Gonzales, went to a location called "The Shop" for the recording of a music video. There were 40-50 young people present, including the victim, 16 year old Daniel Garcia. Gonzales and Garcia got into an argument which led to a fist fight on the street. Gonzales had a gun, which he gave to Petitioner before the fist fight. Petitioner, while watching the fight and yelling for her boyfriend moved the gun from hand to hand. Garcia seemed to have won the fist fight and the two individuals were

9. Mr. Fredlund made a reasonable tactical decision to allow Petitioner's video interview to be admitted which showed Petitioner sticking to her story despite pressure from Detective Munro and her mother. The video statement of Petitioner gave her version of the events at the time of the shooting without the pressure of testifying and being subjected to cross-examination.

10. Mr. Fredlund participated in the Preliminary Hearing, had police reports which included witness statements, as well as, the videos of the actual shooting. The decision to not conduct additional pretrial interviews was not unreasonable because a competent attorney could decide that the videos of the actual shooting together with Petitioner's statement that the gun was grabbed from her by Mr. Gonzales was the best defense and did not require pretrial interviews. Petitioner fails to show that pretrial interviews would have changed the result.

11. Mr. Fredlund moved for a directed verdict of not guilty as an accessory to first degree murder at the close of the State's case. Judge Gary Clingman denied the motion.

12. Mr. Fredlund argued to the jury that Petitioner did not intend the shooting to occur, that the videos of the shooting showed that Gonzales grabbed the gun from Petitioner, and that if Petitioner was guilty of any crime it was involuntary manslaughter. He also argued that Petitioner took the gun from Gonzales before the fist fight to avoid escalating the confrontation.

13. Petitioner was convicted by a jury of First Degree Murder and appealed her conviction to the New Mexico Supreme Court. The New Mexico Supreme Court affirmed the conviction. "This is a classic case where the jury had to resolve conflicting testimony and determine Defendant's intent in light of all the evidence." No. S-1-SC-35277, Decision, p. 13.

14. Judge Clingman sentenced Petitioner to a life sentence with eligibility for parole

b. The Defendant suffered prejudice such that there exists a reasonable probability that but for counsel's unprofessional errors, the results of the proceeding would have been different, 466 U.S. 668 (1984)

20. Mr. Fredlund elicited testimony from witnesses called by the State and used the videos entered into evidence to support Petitioner's theory of the case. Petitioner's jury did not accept her statement as credible. But trial counsel's strategy based upon the video evidence of the shooting and Petitioner's statement the morning after the homicide was a reasonable trial strategy and could have been accepted.

21. In the face of two videos of the homicide showing Petitioner's actions, it was a reasonable trial tactic for Mr. Fredlund to rely upon Petitioner's explanation given to Detective Munro shortly after the shooting without encouraging her to testify.

22. There is nothing in the record before this Court showing that Petitioner suffered any prejudice by any of Mr. Fredlund's actions or that he provided ineffective assistance of counsel.

**IT IS THEREFORE ORDERED** that Petitioner's Petition for Habeas Corpus is denied.

*William G.W. Shoobridge*

**WILLIAM G.W. SHOOBRIDGE**
**DISTRICT COURT JUDGE**

STATE OF NEW MEXICO
FIFTH JUDICIAL DISTRICT
COUNTY OF LEA

SANTANA SERRANO,

                    PETITIONER,

vs.                                                    D-506-YR-2014-00001
                                                       Judge Shoobridge

STATE OF NEW MEXICO, AND
LEON MARTINEZ, WARDEN,

                    RESPONDENTS.

### RESPONSE TO PETITIONER'S "AMENDED PETITION FOR WRIT OF HABEAS CORPUS"

Petitioner, Santana Serrano, files an Amended Petition for Writ of Habeas Corpus, seeking relief from her sentence for committing willful and deliberate first-degree murder as an accessory. In her Amended Petition, she claims she received ineffective assistance of counsel during the various proceedings throughout her case. Most of her claims in the Amended Petition are conclusory and/or are unsupported by the record. The State responds to the arguments made in the Amended Petition that it was able to identify. A review of the facts and proceedings of the case do not support Petitioner's arguments. Her Amended Petition should be denied.

### RELEVANT FACTS AND PROCEDURAL HISTORY

During the trial court proceedings, Petitioner was represented by Mr. Jon Fredlund. The facts at trial established that on May 29, 2014, forty to fifty young people gathered at a venue called "The Shop," for the recording of a music video. [12-8-14 CD 4:30:19-4:33:15] The victim, sixteen-year-old Daniel Garcia, attended. [12-9-14 CD 9:21:20-9:22:18; 12-10-14 CD 9:18:40] Petitioner, who was then seventeen years old, along with her boyfriend, DeAndre Gonzales, also went to "The Shop" that day. [12-9-14 CD 9:56:20-9:56:56:10] Gonzales was

statements asking Petitioner to tell the truth.  [12-9-14 CD 2:10:00]  Petitioner claimed that she

was holding the gun so Gonzales would not do "something stupid" and claimed that she was

hiding the gun from Gonzales. [12-9-14 CD 3:18:05; 3:30:27]  Petitioner also claimed that

Gonzales snatched the gun from out of her hand and shot Garcia.  [12-9-14 CD 3:16:48-3:20:21;

3:22:06]

Mr. Fredlund argued to the jury that Petitioner did not intend for the shooting to occur.

[12-9-14 CD 10:08:22]  Mr. Fredlund argued that the videos of the fight and shooting showed

that Petitioner took the gun so that Gonzales could not have it, and that Gonzales grabbed the

gun from Petitioner before shooting Garcia. [12-9-14 CD 10:12:00]  Indeed, Mr. Fredlund

elicited testimony at trial that Petitioner was not gesturing to Gonzales during the fight.  [12-9-14

CD 10:15:42]  Mr. Fredlund argued that if Petitioner was guilty of any crime, it was involuntary

manslaughter. [12-10-14 CD 10:16:41]

Ultimately, the jury rejected the defense theory and convicted Petitioner of willful and

deliberate first-degree murder as an accessory.  Petitioner was sentenced to life in prison. [Am.

Pet. Ex. B]  The New Mexico Supreme Court affirmed her conviction on direct appeal.  *State v.*

*Serrano*, No. S-1-SC-35277 (N.M. Sup. Ct. Oct. 17, 2016) (non-precedential).

Gonzales was tried separately after Petitioner was convicted at trial.  *State v. Gonzales,*

No. S-1-SC-35291 (N.M. Sup. Ct.  Feb. 11, 2016) (non-precedential).  Gonzales was convicted

of willful and deliberate first-degree murder.  *Id.*  The New Mexico Supreme Court affirmed his

conviction. *Id.*

Both were released on an appeal bond, during which time Gonzales and Petitioner

married. [State's Ex. B]; [State's Ex. D]  Additional facts are developed below.

3

guilt." *Lytle*, 2001-NMSC-016, ¶ 27 (quoting *Strickland*, 466 U.S. at 695). "A reasonable

probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*,

466 U.S. at 694. Petitioner bears the burden of proving both prongs of the *Strickland* test.

*Roybal*, 2002-NMSC-027, ¶ 19.

## I. Petitioner's claims of pre-trial ineffective assistance of counsel fail.

### A. Petitioner's claims of ineffective assistance of counsel with regard to pretrial motions fails.

Petitioner claims that Mr. Fredlund failed to investigate and pursue "potentially

meritorious" pretrial motions, including a motion to continue and a motion to redact Petitioner's

statement to Detective Munro. [Am. Pet. 10] In New Mexico, "trial counsel is not incompetent

for failing to make a motion when the record does not support the motion." *State v. Stenz*, 1990-

NMCA-005, ¶ 7, 109 N.M. 536.

First, Petitioner argues that Mr. Fredlund was ineffective for failing to file a motion to

continue so Petitioner could be tried after Gonzales. [Am. Pet. 14] Petitioner's argument seems

to be that had Petitioner been tried after Gonzales, Gonzales would have testified to statements

made in his affidavit. [Am. Pet. 14]; [Aff. of Deandre Gonzales, filed Jan. 17, 2020]

Gonzales's affidavit was made almost five years after his conviction and imposition of a

life sentence. [Aff. of Deandre Gonzales, filed Jan. 17, 2020] And, Petitioner and Gonzales

married each other after their respective first-degree murder convictions. [State's Ex. B] The

fact of their marriage corroborates the State's argument at trial that Petitioner "[stood] by her

man," prior to, during, and after Garcia's murder. [12-10-14 CD 9:16:10] Gonzales's affidavit

is, at best, an opportunistic attempt to minimize Petitioner's involvement in the killing of Garcia.

Gonzales's affidavit states that he owned the gun used to kill Garcia, that he did not

discuss killing Garcia with Petitioner prior to the murder, and that Petitioner did not know that

5

Petitioner's argument that Mr. Fredlund was ineffective for not moving for a continuance is without merit and should be denied.

Second, Petitioner argues that Mr. Fredlund should have moved to redact Petitioner's recorded statement with Detective Munro. Petitioner argues that Mr. Fredlund erred in stipulating to the video of her recorded statement to law enforcement officers because "the statements of [Petitioner's] mother and the detective were not." [Am. Pet. 15] During trial, the recorded statement of Petitioner with Detective Munro was played for the jury. Petitioner's mother, Lupe Serrano, was also present during this interview, during which she encouraged Petitioner to tell the truth.

If "a reasonable trial tactic [] would explain the counsel's performance," then ineffective assistance of counsel does not exist. *Roybal*, 2002-NMSC-027, ¶ 21. Mr. Fredlund used statements made by Detective Munro and Lupe Serrano during the interview to argue that Petitioner was "grilled" and unreasonably pressured during the statement. [12-10-14 CD 10:12:40-10:13:00] Mr. Fredlund made a tactical decision to allow for the admission of the interview so that he could argue that Petitioner was coerced during the statement, and to support Petitioner's version of her actions in the video without having to testify and be subject to cross-examination. This Court should not second-guess Mr. Fredlund's tactical decision. *United States v. Otero*, 848 F.2d 835, 838 (7th Cir. 1988) ("challenges to strategic or tactical decisions made by trial counsel are off-limits").

In total, Petitioner has made no showing of what pretrial motion should have been filed or how Mr. Fredlund erred in failing to do so. Petitioner cannot establish error on the part of counsel, or that any prejudice resulted that would have changed the outcome of the trial. Hence, Petitioner's claim of ineffective assistance of counsel fails in this regard.

7

**II.  Petitioner's claims of ineffective assistance of counsel during her jury trial fail.**

Mr. Fredlund's trial strategy involved eliciting facts to support the defense interpretation of Petitioner's actions on the videos recording the shooting.  In fact, during his directed verdict motion, Mr. Fredlund stated that the video of the shooting was the "best evidence" in which to evaluate Petitioner's actions.  [12-9-14 CD 4:07:22]  A full review of Mr. Fredlund's statements to the jury makes clear that he intended to establish that Petitioner was dating an older boy, Gonzales, and that Garcia, a younger boy, got the better of Gonzales during the fight, which embarrassed Gonzales.  [12-8-14 CD 4:18:35-4:22:05]  He also argued that Petitioner took the gun away from Gonzales to avoid any escalation of the fight between Gonzales and Garcia, but that Gonzales grabbed the gun from Petitioner and shot Garcia. [12-8-14 CD 4:22:05]; [12-10-14 CD 10:11:20]  Indeed, even the New Mexico Supreme Court, in affirming Petitioner's conviction, stated that "[d]efense counsel asked the jury to 'digest' the video in the context of the trial testimony the jury was about to hear and suggested to the jury that [Petitioner] took the gun from Gonzales to avoid escalating the violence. Both the prosecutor and defense counsel elicited witness testimony and introduced evidence to support their respective theories of the case." *Serrano*, No. S-1-SC-35277, at *6.

In the end, Mr. Fredlund's planned trial strategy was unsuccessful.  However, ineffectiveness is not established on that fact alone.  *State v. Rodriguez*, 1988-NMCA-069, ¶ 17, 107 N.M. 611 ("[i]neffectiveness of counsel is not necessarily established even when there is a showing of improvident strategy or unsuccessful tactics.") (citations omitted).  Petitioner's claim that Mr. Fredlund provided her with ineffective assistance at trial is contradicted by the record. Her specific claims are addressed below.

9

101 N.M. 277, the New Mexico Court of Appeals held that a "defendant's constitutional right to testify may be waived."

The record unequivocally establishes that Petitioner waived her constitutional right to testify. Her bald attempt to accuse Mr. Fredlund of preventing her to testify is unsupported by the record.

### B. Petitioner's arguments advancing alternative defense theories rely on conjecture and hindsight review and should be rejected.

Petitioner claims Mr. Fredlund made no objections or did not move for a directed verdict, but these claims are false. [Am. Pet. 17, 19] Mr. Fredlund moved for a directed verdict of not guilty of murder as an accessory after the close of the State's case. [12-9-14 CD 4:06:17] He specifically argued that Petitioner took the gun away from Gonzales, that Gonzales grabbed the gun back from her, and that no evidence existed that she encouraged the shooting. [12-9-14 CD 4:07:20] The trial court denied that motion. [12-9-14 CD 4:10:08]

With regard to objections, the record demonstrates that Mr. Fredlund objected to Detective Munro testifying as to what Petitioner was saying during her statement with him, and objected to Detective Munro testifying about Petitioner's reactions during the statement. [12-8-14 CD 8:38:15] Mr. Fredlund also objected to the use of a photograph of Garcia being treated at the hospital, which the trial court sustained. [12-9-14 CD 8:24:40-8:26:40] Petitioner's claim of ineffective assistance based on a failure of Mr. Fredlund to raise objections is contradicted by the record and should be denied. *Cf. Salomon v. Moya*, No. CV 07-0740 at *4 (D.N.M. Oct. 26, 2007) (stating that "the state court ruled that since Petitioner did not explain what objections trial counsel should have made or how the defense was prejudiced his ineffectiveness claim was without merit.") (quotation marks omitted).

11

1:48:10-1:49:25]  The jury also heard that Garcia died of a single gunshot wound to the head. [12-9-14 CD 11:44:18-11:48:05]  To the extent Petitioner cites to inconsistent testimony on the issue of the echo or a second shot fired, "it is the exclusive province of the jury to resolve factual inconsistencies in testimony." *State v. Ortiz-Burciaga*, 1999-NMCA-146, ¶ 22, 128 N.M. 382 (quotation marks and citation omitted).  Based on the foregoing, Petitioner cannot show error on the part of Mr. Fredlund, or any resulting prejudice, for failing to investigate the echo produced by Gonzales's firing of the gun.

Petitioner also argues that Mr. Fredlund erred in failing to argue for a self-defense or defense of another instruction.  [Am. Pet. 12-14]  "A defendant is not entitled to a self-defense instruction unless it is justified by sufficient evidence on every element of self-defense." *State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305.  Self-defense and defense of another both require that there be an immediate danger of great bodily harm to themselves or another. UJI 14-5171 NMRA; UJI 14-5172 NMRA.

The evidence at trial established that Garcia and Gonzales agreed to a fist fight, that Garcia got the better of Gonzalez, that the pair had separated before Gonzales shot Garcia.  There was no immediate danger to Petitioner or Gonzales.  Consequently, Petitioner's claim of self-defense, or defense of another, was unsupported by the evidence because the fight between Gonzales and Garcia stopped, and Gonzales fired only shot.  Her claim should be rejected.

In all, Petitioner's claims of ineffective assistance of counsel during trial disregard the facts in the record and Mr. Fredlund's planned trial strategy. *State v. Jacobs*, 2000-NMSC-026, ¶ 49, 129 N.M. 448 ("A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct.").  Her claims of ineffective assistance of counsel during trial fail.

13

Second, Petitioner's reliance on *Alabama v. Miller*, 567 U.S. 460 (2012) is misguided. The United States Supreme Court in *Miller* held that a mandatory life sentence without parole for a juvenile violated the Eighth Amendment's ban on cruel and unusual punishment. 567 U.S. at 489. Petitioner's case lies in sharp contrast to the juvenile in *Miller* because she is eligible for parole after serving thirty years of her life sentence. NMSA 1978, § 31 - 21-10(A) (life imprisonment entails minimum incarceration of thirty years before parole eligibility). *Miller* does not apply to cases such as Petitioner's, because her life sentence was a discretionary sentence imposed by the trial court under New Mexico's Delinquency Act.

Next, the record also does not support Petitioner's claim that Mr. Fredlund was ineffective during her sentencing. Petitioner alleges that Mr. Fredlund failed to provide any mitigating evidence to the trial court and faults the trial court for not considering any mitigating factors. [Am. Pet. 20] As a preliminary matter, the trial court maintains wide discretion in choosing which sentence to impose and properly sentenced Petitioner within the scope of its discretion. *State v. Lavone*, 2011-NMCA-084, ¶ 9, 150 N.M. 473 ("Sentencing statutes indicate the Legislature's intent that district courts have broad sentencing discretion."). The trial court had discretion to choose between imposing a life sentence or a lesser sentence on Petitioner. NMSA 1978, § 31-18-13(A) (1993) ("unless otherwise provided by this section, all persons convicted of a crime under the laws of New Mexico shall be sentenced in according with the provisions of the Criminal Sentencing Act..., provided, that a person sentenced as a serious youthful offender or as a youthful offender may be sentenced to less than the basic or mandatory sentence prescribed by the Criminal sentencing Act."); § 31-18-15.3(D) (1993).

Mr. Fredlund presented a number of letters to the trial court regarding Petitioner, which the trial court reviewed. [3-30-15 CD 9:13:50] Petitioner's mother, Lupe Serrano, spoke and

**IV. Petitioner's remaining claims are without merit.**

    **A. Petitioner's claim that sufficient evidence does not support her conviction should be rejected on its face.**

Petitioner contends that insufficient evidence exists to support her conviction of first-degree murder by accessory liability. [Am. Pet. 29-34] Her claim should not be reviewed.

A habeas proceeding is a post-conviction proceeding. "An asserted insufficiency of the evidence is not a ground upon which post conviction relief may be obtained." *Woods v. State*, 1972-NMCA-128, ¶ 2, 84 N.M. 248. Because sufficiency of the evidence cannot provide Petitioner relief in her post-conviction habeas proceeding, this Court should not consider it.

Nevertheless, her claim fails on its merit. The State presented ample evidence of Petitioner's guilt, which included two videos of the murder. The videos establish that Petitioner was actively involved in the fight between Garcia and Gonzales and that she presented the gun to Gonzales so that he could shoot Garcia. As Gonzales chambered the round, aimed, and fired at Garcia's head, Petitioner exclaimed, "You'll wind up getting shot!" *Alexander*, No. S-1-SC-37058, at *5 (finding sufficient evidence to support defendant's kidnapping conviction by accomplice liability where the victim was locked in the closet to wait for defendant, when defendant arrived, he announced, "I'm here to take care of your problem," and he showed his accomplice who had been beating victim a typed message that read, "I love you. You can do this." to encourage the attacks). Petitioner and Gonzales also fled after the murder. *Flores*, 2010-NMSC-002, ¶ 23 (noting that flight may be indicative of guilt). Petitioner's conviction is supported by sufficient evidence.

Petitioner goes through great lengths to attempt to fit her case into the narrow holding in *State v. Garcia*, 1992-NMSC-048, 837 P.2d 862, a case in which the New Mexico Supreme Court found insufficient evidence of deliberate intent to support a first-degree murder conviction.

2014. [Am. Pet. Ex. B]  The voluntary manslaughter jury instruction, UJI 14-220, was amended to be effective on December 31, 2014.  [State's Ex. C]  That amendment included the element to the voluntary manslaughter jury instruction that "[t]he defendant acted as a result of sufficient provocation."  [State's Ex. C]  Petitioner cannot claim error with the jury instruction because it was given in accordance with the law at that time.

Petitioner also claims that the instructions were "inherently contradictory and confusing." [Am. Pet. 35]  They were not.  The trial court instructed the jury on the elements of accessory liability, first-degree murder and lesser included offenses, and the order of offenses in which jurors were to deliberate.  [Am. Pet. Ex. E, Instruction No. 3, 10]

"Juries are presumed to have followed the written instructions." *State v. Smith*, 2001-NMSC-004, ¶ 40, 130 N.M. 117.  Here, the jury was instructed to deliberate on the accessory elements and the charge of first-degree murder first, and if the jurors did not agree that the Petitioner was guilty of first-degree murder by accessory liability, then the jurors were to consider the lesser degrees of homicide.  The jury found Petitioner guilty of first-degree murder as an accessory and therefore, did not need to consider Petitioner's guilt on the lesser degrees of murder.  Consequently, Petitioner's claim of confusing jury instructions is immaterial based on the jury's decision in her case.

## CONCLUSION

In total, Petitioner's claims of ineffective assistance of counsel fail as a matter of law and substance.  No evidentiary hearing is required.  Her Amended Petition should be dismissed.

IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**SANTANA SERRANO,**
  **Petitioner,**
**vs.**

S.Ct. No. _____

**STATE OF NEW MEXICO, and**
**LEON MARTINEZ, Warden**
  **Respondents.**

D-506-YR-2014-00001

## PETITION FOR WRIT OF CERTIORARI
## TO THE FIFTH DISTRICT COURT OF NEW MEXICO

Petitioner, by and through appointed counsel Jason Wheeless (counsel will assist

with the preparation and filing of this Petition only), and pursuant to the provisions of the

New Mexico Constitution, Rule 5-802, and Rule 12-501 NMRA, petitions this Court to

issue its Writ of Certiorari to review the order in **Santana Serrano v. Leon Martinez**, **D-506-yr-2014-00001** filed on October 7, 2020.

Petitioner further requests that the Court appoint the Law Offices of the Public

Defender to represent her on appeal, should the Court grant certiorari.

## QUESTIONS PRESENTED FOR REVIEW

Whether the district court erred in holding: **1)** counsel provided effective assistance of

counsel; **2)** Petitioner's (a "serious youthful offender") sentencing procedures complied

with the 8th Amendment and New Mexico law; **3)** the jury instruction for accessory

liability when read with the four homicide instructions is not unconstitutionally

confusing and contradictory in violation of Petitioner's right to a fair trial and due

process of law.

## PRIOR PROCEEDINGS

In 2014 Petitioner's then boyfriend Deandre Gonzales, shot and killed Daniel Garcia after a brief fight. Petitioner held Mr. Gonzales's pistol, cell phone and clothing during the fight and handed the pistol back to Mr. Gonzales just before he shot and killed the decedent.

Petitioner was charged with First Degree Murder and became a "serious youthful offender." (Deandre Gonzales was charged and tried after Petitioner.). John Fredlund was retained to represent her at trial and sentencing. Petitioner was convicted after a two day trial. At trial the state relied primarily on an accessory theory since Petitioner did not herself kill the decedent. Three months later, after a 19 minute sentencing hearing, Petitioner was sentenced to the maximum sentence of life with the possibility of parole. In opinion S-1-SC-35277, the Supreme Court denied Petitioner's direct appeal.

On July 2019, Petitioner filed a Pro Se Petition for Writ of Habeas Corpus. On August 2019, the LOPD was appointed to represent her. In December 2019, counsel filed the Amended Petition for Writ of Habeas Corpus. At the evidentiary hearing trial counsel, Petitioner and a detective testified. The parties timely filed proposed findings of law and fact. On October 7, 2020, the district court issued its Order Denying Petition for Habeas Corpus.

## BASIS FOR GRANTING THIS PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT COURT

The order of the district court on the Amended Petition for Writ of Habeas Corpus raises significant questions of law about whether the errors below deprived Petitioner's

rights guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments and by

New Mexico Constitution, art. II, sections 13, 14, 15, and 18.

## FACTS, LAW AND ARGUMENT

**Point 1**: The district court erred when it found trial counsel provided effective

assistance of counsel when trial counsel did not conduct any investigation, did not

interview witnesses, stipulated to damaging state's evidence after having successfully

objected to much of the evidence, told the jury a first degree murder had occurred, did

not try to locate exculpatory witnesses identified to him by Petitioner, failed to determine

if Mr. Gonzales would testify on Petitioner's behalf or file a motion to continue so that he

would have the opportunity to, and a failed to develop any coherent defense or present

any available exculpatory evidence. In sum, trial counsel essentially put up no defense.

The district court's order found that because trial counsel was experienced,

participated in the preliminary hearing and reviewed discovery, his refusal to do any

investigation or interview state's witnesses was a "reasonable tactical decision." The

district court found that trial counsel's defense strategy of stipulating to, and relying on,

the lengthy and prejudicial interrogation video used by the state as evidence of

Petitioner's guilt was a "reasonable trial strategy."

The district court order makes no mention of many of the assignments of error

concerning that video's contents made by Petitioner: although stipulated to, it contains

evidence trial counsel had successfully objected to; the detective repeatedly calls

Petitioner a liar, tells her she behaves like she does not care, repeatedly misstates the law

of accessory liability and falsely claims Mr. Gonzales had confessed to Petitioner's role; and much of the video consists of Petitioner's mother emotionally berating her about her truthfulness.

The district court failed to consider all evidence from the trial record and hearing testimony which is relevant to the analysis of ineffective assistance. Petitioner gave trial counsel the names of two eye witnesses who had relevant exculpatory evidence but who counsel made no attempts to locate; Petitioner told trial counsel she was friends with the decedent and that she believed any problems between the boys had been resolved weeks earlier at a carnival; Mr. Gonzales provided an affidavit to habeas counsel stating he would have testified for Petitioner had he been given the chance and that she knew nothing about nor did she help in the shooting; in opening, counsel told the jury a first degree murder had occurred; he argued with the detective during cross examination over the difference between accessory after-the-fact and harboring a felon thus misrepresenting accessory law; he stipulated to the autopsy report showing the decedent had intoxicants in his system and called no witness to interpret that evidence; allowed an officer to lay the foundation for the autopsy photos and interpret their contents; and allowed the cell videos to into evidence through witnesses who could not lay foundations for them.  The order states trial counsel argued that Petitioner took the gun to avoid an escalation of violence but does not mention counsel also contradicted that by arguing he did not "condone" Petitioner's acts.

Counsel testified he was "overconfident" the jury would see the state's evidence as exculpatory and that led him to not fully prepare or investigate.  Counsel never explained why he advised Petitioner not to testify out of a fear of the prosecution twisting her words when he stipulated to the state's videos that contained Petitioner's words.

At the 19 minute sentencing hearing counsel put on no mitigation beyond Petitioner's apology, her mother's pleas for mercy and noting her youth.  The order states the sentencing court considered her youth but nothing in the record shows this.  The sentencing court in fact assigned complete blame for the shooting to Petitioner.  Counsel testified he put on no mitigation case because his familiarity with Judge Clingman led him to believe that three months earlier at the trial he "sensed" "mannerisms" indicating the court did not believe Petitioner was as culpable as Mr. Gonzales. Counsel testified he did not believe he would have time records showing his work on the case.

A claim of ineffective assistance of counsel requires a petitioner to show that counsel's representation "fell below an objective standard of reasonableness" and, that the deficiencies prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id., 466 U.S. at 687.  However, "the mere incantation of strategy does not insulate attorney behavior from review." Brecheen v. Reynolds, 41 F.3d 1343, 1369 (10th Cir. 1994). The proper measure is reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688.

Counsel has a duty of loyalty, duty to investigate and a duty to advocate for his client.  See Fisher v. Gibson, 282 F.3d 1283.  "[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about bow best to represent his client." Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). "[A] failure to investigate, especially as to key evidence, must be supported by a reasonable and deliberate determination that investigation was not warranted." O'hara v. Wiggington, 24 F.3d 823, 828 (6th Cir. 1994). "Duty to present mitigating evidence . . . is not independent of the duty to investigate and prepare." Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). "Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of the trial." Battenfield v. Gibson, 235F.3d 1215, 1226 (10th Cir. 2001).

Prejudice requires a defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is one that undermines confidence in the outcome." Strickland, 466 U.S. at 694. In the prejudice inquiry the focus should be on whether the result of the trial was fundamentally unfair or unreliable. Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). Petitioner must show prejudice by less than a preponderance of the evidence and a showing of innocence is not required. Fisher v. Gibson, 282 F.3d 1283, 1307 (10th Cir. 2002).

The district court's findings are erroneous.  Trial counsel never subjected the state's case to any meaningful adversarial testing leaving a trial and conviction that can

not be relied upon as fair.  Trial counsel did not investigate, locate or present exculpatory witnesses or evidence known to him leaving him unprepared for trial. There is no strategy in failing to provide mitigation at sentencing in a case of this type.  Trial counsel's errors resulted in an almost a complete lack of a defense.  Had counsel avoided the errors above and put on any defense and had any juror believed it, there would have been reasonable doubt

**Point 2:** Because Petitioner was a juvenile tried as an adult for the state's highest crime and trial counsel failed to present any mitigating evidence consistent with Miller v. Alabama, 567 U.S. 460, (2012), and the sentencing court failed to consider the same, the sentencing hearing violated the 8th Amendment's prohibition against cruel and unusual punishment and its proportionality requirement.  The pre-sentence report did not comply with statutory sentencing requirements or Correction's Department policies.

The Eighth Amendment's injunction against excessive sanctions "flows from the basic precept of justice that punishment for a crime should be graduated and proportioned to both the offender and the offense." Miller v. Alabama, 567 U.S. 460, 469 (2012)(internal citations omitted).  An offender's age is relevant to the Eighth Amendment. Id. at 473. Because juveniles have diminished capacity, "they are less deserving of the most severe punishments." Id. at 471, quoting Graham, 560 U.S. at 68.  The "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders even when they commit terrible crimes."  Miller, 567 U.S. at 472. "[O]ur individualized sentencing cases . . .teach that in imposing a State's harshest

penalties, a sentencer misses too much if he treats every child as an adult." <u>Miller</u>, 567 U.S. at 477. The <u>Miller</u> Court summarized the "gaps" between adults and juveniles that are relevant in fashioning juvenile sentences that are proportional for 8[th] Amendment purposes. <u>Miller</u>, 567 U.S. at 471, see also <u>Ira v. Janecka</u>, 419 P.3d 161 (N.M., 2018)(summarizing the Miller factors).

A one and a half page pre sentence report was produced but contained almost no information relevant to sentencing. The report did not even contain the information required by Corrections Department policies (Those policies are incorporated here by reference to the Amended Petition for Writ of Habeas Corpus). "[A] trial court has no jurisdiction to impose a sentence accept in accordance with the law..." <u>State v. Mares</u>, 119 N.M. 48, 50 (1994). Preparation of and submission of a presentence report is is a mandatory precedent to a child's sentencing as a serious youthful offender. <u>State v. Gutierrez</u>, 2011-NMSC-024, ¶ 66.

The 8th Amendment required that mitigating factors consistent with those in <u>Miller</u>, be developed and provided to the sentencing court prior to the sentencing hearing. Only after considering that information might the judge have lawfully sentenced Petitioner to life with the possibility of parole. Furthermore, the pre-sentence report did not comply with New Mexico law or policy. As a result, the sentencing hearing was unlawful.

**Point 3:** The accessory instruction and the homicide instructions as given in this case are inherently contradictory and confusing violating due process and the right to a fair trial.

The accessory instruction states, in part, "The defendant may be found guilty of a crime even though he himself *did not do the acts* constituting the crime". The instructions for First Degree Murder, Second Degree Murder, Voluntary Manslaughter and Involuntary Manslaughter all require a finding find *that the defendant killed* or, as is with involuntary manslaughter, *caused* the death of the victim.  Trial counsel did not object to the instructions and the issue was not raised on appeal.

"The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." State v. Sutphin, 2007-NMSC-045, ¶ 16.

The first question when reviewing a jury instruction for fundamental error is "whether a reasonable juror would have been confused or misdirected by the jury instruction." See Barber, 2004-NMSC at ¶ 19. If the answer is yes, "[f]undamental-error analysis then requires a higher level of scrutiny." Id. "If we find error, our obligation is to review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." Id."[F]ailure to instruct the jury on an essential element . . . ordinarily is fundamental error when the defendant fails to object or offer a curative instruction."Id. At ¶ 20.

Since the state relied on an accessory theory the jury instructions for the crimes should have incorporated the accessory language so as to properly instruct on what the law

requires. As given, without reference to any specific crime, the bare accessory instruction

is misleading about the mens rea and actus reas elements of the substantive crimes and

could have led the jury to convict because they believed the defendant intended some or

any crime to occur since the instruction is not explicitly linked to any specific crime; or, led

them to believe that if Petitioner was an accessory they could ignore the mens rea

requirement of the substantive crime; or, the jury may have found that the defendant

actually did the killing. That is likely since the instructions for the crimes invited the jury to

consider just that. The jury cannot be expected to ignore the plain meaning of the words

they are told to faithfully follow.

## REQUEST FOR RELIEF

Petitioner requests that this Court issue a writ of certiorari, find that trial counsel was

constitutionally ineffective at trial and sentencing and that the jury instructions were

confusing and reverse the conviction or order the district court to do so. Alternatively, the

Court should issue its writ to the district court and remand for a new sentencing hearing.

Respectfully submitted,


_____/s/ JW electronically_____
Jason B. Wheeless, Esq.
Attorney for Petitioner
NM Bar # 23563
276 NE 2nd St. #206
Prineville, OR 97754
(505) 261-2230, jbwlaw505@gmail.com

I hereby certify that a true and correct copy of the foregoing was sent to Counsel for Respondent upon filing.
 /s/Jason Wheeless
Jason B. Wheeless, Esq.

**STATE OF NEW MEXICO**
**COUNTY OF LEA**
**FIFTH JUDICIAL DISTRICT COURT**

**SANTANA SERRANO,**
   **Petitioner,**
**vs.**

**No. D-506-YR-2014-00001**
**(Hon. William Shoobridge)**

**STATE OF NEW MEXICO, and**
**LEON MARTINEZ, Warden**
   **Respondents.**

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW Petitioner, Santana Serrano, through her counsel Jason B. Wheeless, Attorney on Contract with the Law Offices of the Public Defender, and pursuant to Rule 5-802 NMRA and Article II, Sections 1, 7, 12, 13, 14, 15, and 18 of the New Mexico Constitution and the 5th, 6th, 8th and 14th Amendments of the United States Constitution and respectfully submits this Amended Petition for Writ of Habeas Corpus.

Ms. Serrano respectfully requests that this Honorable Court issue a Writ of Habeas Corpus and either set aside her conviction and dismiss her case or set aside her conviction and order a new trial or vacate the sentence and remand for a new sentencing hearing. She seeks to vacate, set aside her sentence and order of confinement. Ms. Serrano contends that she was denied her state and federal constitutional rights to due process, a fair trial, effective assistance of counsel and her right against cruel and unusual punishment. The following amendments are made to the *pro se* petition filed on June 13, 2019.

1. **Place of Confinement:** Ms. Serrano is currently detained by Warden Leon Martinez at New Mexico Women's Correctional Facility in Grants, New Mexico.

2. **Nature of Proceedings Resulting in Confinement:** On June 20, 2014, at the age of 17, Ms. Serrano was charged in a single count information with First Degree Murder

1

– deliberate and premeditated, in violation of NMSA, 30-2-1(A), and thus became a "serious youthful offender" as that term is defined by NMSA, 32A-2-3(H). After a two day trial commencing on December 8, 2014, a jury convicted Petitioner of the only charge contained in the information. At trial the state argued accessory liability since it was Deandre Gonzales, Petitioner's then 18 year old boyfriend, (D-506-CR-2014-00488) who fired the gun that resulted in the killing. Because the verdict was general in nature it is not known if the jury found that Ms. Serrano actually killed the decedent or that she was an accessory. Ms. Serrano and Mr. Gonzales were tried separately and their cases were never joined. *See* NMRA, 5-203(B) ("Two or more defendants[...]will be joined by the filing of a statement of joinder by the state contemporaneously with the filing of the" charging documents.) On December 16, 2014, after the jury had rendered its guilty verdict, trial counsel filed a motion for new trial alleging prosecutorial misconduct for the prosecutor's use in its closing argument of a cell-phone video of the shooting with enhanced audio and with Petitioner's alleged words superimposed over the video. The enhanced version of the video with the superimposed words had not been put into evidence and the person who enhanced the video did not testify about the enhancements at trial. In a written decision after a hearing, the trial court denied the motion. **(Exhibit A – Decision on Motion).** On March 30, 2015, after a 19 minute sentencing hearing in which trial counsel presented no evidence or legal arguments, Petitioner was sentenced to life pursuant to NMSA, 31-18-13(A) & 31-18-15.3(D). **(Exhibit B - J&S)**

**3. Direct Appeal:**

2

On February 1, 2016, appellate counsel filed Petitioner's Brief in Chief in her direct appeal to the New Mexico Supreme Court. Appellate counsel presented two issues: 1) In the absence of an indictment or bind-over order, the district court lacked jurisdiction to try Petitioner, and 2) Appellant was denied a fair trial when the prosecutor superimposed statements onto the video of the shooting it used during closing arguments.

In No. S-1-SC-35277, **(Exhibit C – Memorandum Opinion)** the NMSC affirmed Petitioner's convictions in a non-precedential opinion. On the first issue, the NMSC found that there actually was a proper charging document and that there was no prosecutorial misconduct and therefore the trial court did not abuse its discretion in denying the motion for a new trial.

## 4. Prior Petitions:

Petitioner previously filed a Pro-Se Petition for Writ of Habeas Corpus on August 28, 2017. Petitioner raised claims of ineffective assistance of trial and appellate counsel.  Concerning appellate counsel, Petitioner argued he failed to adequately review the case and only raised two issues that were later deemed without merit by the New Mexico Supreme Court.  Petitioner argued trial counsel had failed to subject the case to an adversarial testing, failed to provide any meaningful defense and made several errors.  Specific issues raised were 1) picking an almost entirely white, male jury and relying on a "sex appeal" defense; 2) failure to timely object to the prosecutor's closing video; 3) the jury pool was tainted by pre-trial publicity; 4) since Petitioner was a juvenile counsel should have had her evaluated by a forensic psychologist who could have then testified to the developmental and behavioral characteristics of juveniles

3

generally and Petitioner specifically; (5) failure to have Petitioner take a pre-trial polygraph; (6) failure to engage in plea negotiations; (7) failure to investigate and interview any witnesses. That petition was denied by written order without hearing on October 27, 2017. In the order the district court made no findings of law or fact. Petitioner subsequently petitioned the New Mexico Supreme Court for a writ of certiorari. On December 28, 2017 in S-1-SC-36769, the Court summarily denied the petition.

Petitioner has previously raised some of the issues presented in her pro se petition. She respectfully submits that the ends of justice merit a re-consideration of those claims. *See* State v. Canales, 1967-NMSC-221, 78 N.M. 429 (the court may entertain a petition raising successive claims in the interests of justice). This is particularly true when considering that she was a juvenile convicted as a "serious youthful offender" and sentenced to life, the obvious constitutional deficiencies of her sentencing hearing. *See* Miller v. Alabama, 567 U.S. 460 (2012)(Describing the type of evidence a court must consider before sentencing a juvenile to the most serious sentences.), and that she has not before had the assistance of counsel in developing her claims and the opportunity to present evidence of those claims. All claims will not be repeated and additional claims will be made in the Amended Petition.

## 5. **Habeas Representation/ Timeliness of Petition:**

Petitioner filed her *pro se* petition for habeas corpus on June 13, 2019. The LOPD Filed a Notice of 5-802(H)(1) Pre-Appointment Review on August 6, 2019. On August 12, 2019, the district court found the petition to be a "proceeding which a reasonable person would bring at the person's own expense" and appointed the LOPD.

4

At the request of Petitioner's counsel the deadline for filing the Amended Petition was extended to December 10, 2019.  This Amended Petition is timely filed by December 10, 2019.

6. **Relief Requested**:

This petition seeks to vacate and set aside Ms. Serrano's conviction on the grounds that she was denied her state and federal constitutional rights to due process, a fair trial and effective assistance of counsel.  Should the Court determine that not to be the case Ms. Serrano asks that her sentence be vacated and she be ordered a new sentencing because her sentencing hearing and the resulting sentence violates her state and federal rights against cruel and unusual punishment.

7. **Issue Presented in this Petition.**

Petitioner raises several issues in this Amended Petition, some of which overlap:

A.      Petitioner received ineffective assistance of counsel at trial, sentencing and appeal in violation of the 6th and 14th Amendments and Article II, §§'s 12 & 14.

B.      Petitioner's convictions were had in violation of her rights to due process under the 5th and 14th Amendments and Article II, § 18.

### Statement of Facts/Procedural History

On the night of May 29, 2014, Ms. Serrano, then 17, and her boyfriend Deandre Gonzales, then 18, attended the filming of a music video at an establishment called the The Shop, in Hobbs, New Mexico.  The Shop was rented out for parties and similar occasions. Witnesses testified that a general invitation to the event had been posted on social media.

5

The makers of the video wanted people there so it would appear that the video was made in a club full of people. Ms. Serrano and Mr. Gonzales arrived at The Shop after most of the attendees were already there.

Prior to their arrival, Daniel Garcia (16 year old decedent) arrived at the Shop with David Lechuga and at least one other person. Daniel Garcia and his group had been drinking alcohol and smoking marijuana. Autopsy results showed both alcohol and THC in his body at the time of death. David Lechuga testified that he was "buzzed" on the night of the incident. **(TR 12/9, p. 55).**

Soon after his arrival Deandre and Daniel had a verbal altercation inside of the The Shop. The altercation was over a dispute between family members of Daniel and Deandre and not anything personal between them. Ms. Serrano stated that Deandre went to speak to a cousin sitting next to Daniel and Daniel then challenged him. Others stated that Deandre initiated the situation. David Lechuga encouraged Daniel to fight. Believing Daniel was about to fight, the adult DJ, David Romero, stopped Daniel and told him not to fight. The two boys left the building to fight followed by 30 – 50 of the other attendees. At least two people filmed the fight with their cellular phones and those videos were placed into evidence at trial and one was used by the State in its closing (The videos will be shown at the evidentiary hearing).

Prior to the fight Deandre handed his hat, shirt and pistol to Ms. Serrano. The fight commenced and Daniel clearly got the best of Deandre by punching him to the ground. Deandre suffered a cut on his head and a swollen eye. At a point when Deandre was clearly losing the fight Ms. Serrano can be seen screaming and pushing Daniel. At times she had the pistol in her hand. David Romero came outside and broke the fight up. Daniel

6

returned to his group of friends but facing Deandre in an aggressive way. Daniel Lechuga can be seen patting Daniel on the chest and heard encouraging him to fight more.

After the fight broke-up, Deandre walked straight to Ms. Serrano, retrieved his pistol and immediately fired. As he was reaching for the pistol Ms. Serrano can be heard saying, "Here it is." The video shows Ms. Serrano talking to another man just before Deandre approached her for the pistol. Ms. Serrano says the man's name is Ray Ortega and she was telling the man that she would text him later about possibly meeting up with with her and Deandre. (She states she told Mr. Fredlund about this but that he made no efforts to find Ray Ortega. Investigator Richard Mayfield is now looking for Ray and has been told that he moved to Lubbock, Texas.) After he fired the shot Deandre and Ms. Serrano fled the scene along with several others. Daniel received a single gunshot wound to the head. David Lechuga waived down a passerby and they loaded Daniel into his car and took him to the hospital. Daniel was later flown to Lubbock where he died from the gunshot wound.

Police responded soon after. At the scene a single 9mm shell casing was recovered but no projectile was ever found and no weapon capable of firing a 9mm round was ever found. Police searched a Black Chevy Tahoe they found leaving the scene in a suspicious way and located a .380 caliber pistol. Police apparently decided this vehicle and its occupants were unrelated to the shooting. At least five witnesses and Ms. Serrano reported hearing more than one gunshot. Defense counsel does not seemed to have investigated this.

In the early morning hours following the shooting, Ms. Serrano and Deandre were arrested from inside Ms. Serrano's mother's house. Ms. Serrano was questioned with her

7

mother present by Detective Munro wherein she denied knowing Deandre was going to shoot Daniel when he retrieved his gun from her.  Soon thereafter Ms. Serrano's family retained defense counsel Jon Fredlund to represent her.

On June 30, 2014, a criminal information was filed charging Ms. Serrano with one count of First Degree Murder (Willful and Deliberate). **(Exhibit D – Criminal Information).** On December 8, 2014, her jury trial commenced and the jury returned a verdict of guilty on December 10.  Deandre Gonzales was tried and convicted separately the following year.    The jury was instructed on accessory liability (UJI 14-2822) and all levels of homicide and manslaughter and given the step-down instruction.  The accessory instruction was given separately from the other instructions and was not incorporated in them. **(Exhibit E – Jury Instructions).**

On June 3, 2015, trial counsel filed Defendant-Appellant's Statement of the Issues raising three issues: the denial of the Motion for New Trial, the motion for directed verdict and whether trial counsel provided ineffective assistance of counsel for failing to contemporaneously object to the state's use of the enhanced cell phone video. **(Exhibit F – Statement of Issues).**

Thereafter appellate counsel Stephen Aarons was retained.  On February 1, 2016, he filed Ms. Serrano's Brief in Chief with the New Mexico Supreme Court.  In the Brief, counsel raised only two issues: 1) in the absence of an indictment or bind-over order the district court lacked jurisdiction to try Ms. Serrano; and, 2) Defendant was denied a fair trial when the prosecutor superimposed statements onto a Closing Video during closing arguments.  The Supreme Court found both arguments to be without merit.

8

## **Argument**

If a petition for a writ of habeas corpus demonstrates on its face that a Petitioner may have been deprived of her constitutional rights, the court must address the issue in an evidentiary hearing, unless it plainly appears that the petitioner is not entitled to any relief as a matter of law, based on the facts alleged in the petition, or the uncontroverted facts shown by the court record. **State v. Franklin**, 1967-NMSC-151, ¶ 6, quoting **Machibroda v. United States**, 368 U.S. 487 (1962); see also **Duncan v. Kerby**, 1993-NMSC-011, ¶ 3 (court must hold an evidentiary hearing where a petition adequately alleged ineffective assistance of counsel). If the petition raises factual issues which cannot be conclusively determined from the files and records of the action, the petitioner is entitled to an evidentiary hearing. **Franklin**,1967-NMSC-151, ¶ 6; **State v. Patton**, 1970-NMCA-105, ¶ 6, (claim that guilty plea was coerced justifies a hearing).

Habeas corpus proceedings are the preferred method for adjudicating claims of ineffective assistance of counsel, because such claims often cannot be considered based solely on the record before the trial court. **Duncan**,1993-NMSC-011, ¶ 4. Consequently, when a petition for a writ of habeas corpus alleges particular facts which set out a claim of inadequate representation, the petitioner is entitled to a hearing. **State v. Moser**, 1967-NMSC-163, ¶ 6, 78 N.M. 212 (overruled on other grounds) .

Ms. Serrano adequately alleges claims, which entitle her to legal argument and/or an evidentiary hearing on the following grounds:

## I. PETITIONER WAS DENIED HER 6TH AMENDMENT AND ARTICLE II, § 14 RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES.

9

The Sixth Amendment's right to counsel guarantee requires that effective assistance of counsel be given at all stages of the proceedings, and New Mexico has affirmed this right. U.S. Const. amends. VI and XIV; N.M. Const. art. II § 14, **Lukens v. Franco**, 433 P.3d 288, 294 (N.M., 2018)("Criminal defendants in New Mexico are entitled to effective assistance of appellate counsel"). Defense counsel's performance is measured against "an objective standard of reasonableness." **Strickland v. Washington**, 466 U.S. 668, 688 (1984). "The standard for ineffective assistance of counsel is whether defense counsel exercised the skill, judgment, and diligence of a reasonably competent attorney." **State v. Crislip**, 109 N.M. 351, 354 (N.M., App. 1989). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction..." has two components. First, the defendant must show that counsel's performance was deficient... Second, the defendant must show that the deficient performance prejudiced the defense." **Strickland**, at 687.

To prevail, a petitioner must show "her counsel's performance fell below the standard of a reasonably competent attorney..." **Crislip**, at 353. Prejudice is measured by "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." **Id.** At 354, citing **Strickland**, at 695. "In reviewing an ineffectiveness claim, the entire proceeding must be considered as a whole." **Crislip**, at 354.

A. _**Trial Counsel failed to investigate and pursue potentially meritorious pre-trial motions.**_

Trial Counsel failed to investigate and file pre-trial motions that would have substantially limit Ms. Serrano's exposure at trial. Counsel's failure to pursue potentially meritorious pre-trial motions raises substantial questions of ineffective assistance of counsel. See **State v. Luna**, 1979-NMCA-048, ¶ 27, 92 N.M. 680 (Court addressed issues relating to ineffective assistance of counsel for failure to file pre-trial motions regarding

10

charge of conspiracy when 3 other co-defendants had that particular charge dismissed, leaving no one to conspire with.) "The testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies,... counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." **Kimmelman v. Morrison**, 477 U.S. 365, 384 (1986) (internal citations omitted); see also **Strickland**, 466 U.S. at 687-88.   Defense counsel in a criminal case has a duty to "conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." **ABA Standards on Criminal Justice: Prosecution and Defense Function**, Standard 4-4.1(a) (3d ed. 1993).   The failure to pursue an adequate pretrial investigation may establish grounds for finding ineffective assistance of counsel. **State v. Barnett**, 1998-NMCA-105, ¶ 30, 125 N.M. 739, citing **ABA Standards for Criminal Justice Pleas of Guilty**, Standard 14-3.2 (2d edition 1980).

Reasonable professional performance includes a duty to investigate all reasonable lines of defense.   **Fisher v. Gibson**, 282 F.3d 1283, 1291 (10th Cir. 2002), citing **Strickland**, 466 U.S. at 691.   Defense counsel's failure to investigate adequately a defendant's central defense renders any resulting defense strategy flawed. **Battenfield v. Gibson**, 236 F.3d 1215, 1228-29 (10th Cir. 2001).

"A decision not to investigate cannot be deemed reasonable if it is uninformed." **Fisher**, 282 F.3d at 1296.  A failure to investigate a key witness or piece of evidence must instead be "supported by a reasoned and deliberate determination that investigation was not warranted." **O'Hara v. Wigginton**, 24 F.3d 823, 828 (6th Cir. 1994). The failure to pursue information from a key witness regarding the basis of the accused's most important defense

11

cannot be considered sound trial strategy. **Sanders v. Ratelle**, 21 F.3d 1446, 1456 (9th Cir. 1994). Counsel is ineffective is he fails to conduct an adequate investigation into the defendant's most viable theory of the defense. **Bigelow v. Williams**, 367 F.3d 562, 572 (6th Cir. 2004) (reasonable prudence should lead lawyer to recognize the importance of potential witness testimony). "A defendant is not entitled to an attorney who will 'leave not the smallest stone unturned'...but when the defendant has but one stone, it should at least be nudged." **Coleman v. Brown**, 802 F.2d 1227, 1234 (10th Cir. 1986) (internal citations omitted).

It is believed trial counsel did no pre-trial investigation or any witness interviews. Habeas counsel reached out to trial counsel on at least three occasions but received no reply.

Ms. Serrano has consistently maintained that she did not know Deandre intended to shoot Daniel Garcia and that when she handed the gun to Deandre she was merely returning to him his property. In the videos of the shooting Ms. Serrano can be seen standing next to and speaking to a man immediately before Deandre took his gun from her and fired the shot. Ms. Serrano states the man is ~~Ray Ortega~~ and she was talking to him about getting in touch later in the evening and maybe hanging out together. Ms. Serrano states she told trial counsel of Mr. Ortega but that he made no efforts to locate him. Habeas counsel has employed an investigator who is trying to locate Mr. Ortega. Preliminary investigation indicates he is now in Lubbock, Texas. Mr. Ortega's testimony would show that Ms. Serrano was thinking and talking about other things immediately before she handed the pistol back to Deandre. Mr. Ortega's testimony would would show that Ms. Serrano was unaware of Deandre's intentions, that she did not intend a crime to be committed and was in no way encouraging, helping or causing the crime to occur which are both elements of accessory

12

liability (see UJI 14-2822) and that she certainly did not have the "deliberate intent" to kill required of First Degree Murder. See **UJI 14-201** (the killing must have been done with the deliberate intention to take away a life).

Police reports indicate that at least six other people (co-defendant Deandre Gonzales, Michael Martinez, Saber Carney, Michael Ortega, David Romero III, and David Romero Jr.) besides Ms. Serrano claimed to have heard more than one gun shot. Showing that there was another shooter would bolster a theory that Deandre was sufficiently provoked or that he was acting in self-defense or defense of others. It would show that he did not have the deliberate intention of taking Daniel's life. It is believed that defense counsel made no effort to interview these witnesses or develop evidence of a second shot or shooter despite these witness claims and the police stopping a vehicle leaving the scene that contained a pistol.

Witnesses who were interviewed told police that between 30 and 50 people attended the fight that resulted in Daniel's death. Based on what defense counsel told Ms. Serrano it appears he made no efforts to find or talk to any of them. Since at least seven people had heard a second shot it is likely at least some of the others would have corroborated this.

Daniel's autopsy report indicated he had alcohol and THC in his system at the time of his death. Defense counsel made no effort investigate this or find an expert who could testify to the affects of alcohol and THC. This evidence would have further supported a claim of provocation or self defense by showing that intoxicated people are generally more irrational. In any case, the lack of an expert report prevents Ms. Serrano from showing prejudice on this point which, is a type of prejudice in itself. See **State v. Jose S.**, 2007-NMCA-146, ¶ 21 (Child has no way of demonstrating that the reports would be favorable to him ... because the

13

report's were never created. This inability to demonstrate prejudice is itself prejudicial to Child).

Defense counsel filed no motion for a continuance so that Ms. Serrano could be tried after Deandre allowing him to testify on her behalf. Deandre Gonzales told habeas counsel's investigator Richard Mayfield, that the gun was his, that Ms. Serrano did not know he was going to shoot Daniel and had nothing to do with the shooting. He has offered to sign an affidavit to this affect. As soon as it can be arranged, Mr. Mayfield plans on obtaining this affidavit from Deandre.

In the video (State's Exhibit 52) of Ms. Serrano's interrogation **(TR 12/9, pg's 181 – 220)** she tells Det. Munro that she heard another shot. Det. Munro tersely tells her that she heard an echo.   The detective claimed that he had done some sort of test to verify that the second shot was actually an echo.  Trial counsel apparently never investigated this claim despite having the interrogation video, nor did he subject the detective to any cross-examination about it.

Also in the video the detective repeatedly calls Ms. Serrano a liar and accuses her of not caring that Daniel died. He tells her that he sees nothing from her but "I don't give a shit!", that "The only word I can come up with is cold-hearted, like you don't care that this man dropped dead," and that "everyone is crying but you."  The detective states his theory of the incident and his opinion of accessory liability. He states Deandre was losing the fight so he decided to kill Daniel and Ms. Serrano "helped him get away with it," "100 percent simple accessory to murder." He says that if she didn't want it to happen she would have "chewed" Deandre out once they were in the car. During cross-examination the detective offered an incomplete and legally incorrect opinions about accessory liability. **(TR 12/9, pg's 221 –**

14

**227).** He states, "The statute identifies, if you assist before, during or after, that it meets the statute for an accessory." The detectives theory completely omits the mens rea requirement for accessory and is misleading. The statement made it into evidence and stood uncorrected by trial counsel. The video also contained long sections of Ms. Serrano's mother emotionally screaming at her and telling her not to lie out of the presence of the detective.

While certainly most of Ms. Serrano's statements were admissible the statements of her mother and the detective were not. The detective's theories, his insults about Ms. Serrano's veracity and his opinions on the law were irrelevant hearsay whose probative value was substantially outweighed by the danger of unfair prejudice. The statements made by Guadalupe Serrano implying that Ms. Serrano was lying were irrelevant and prejudicial. Furthermore, there was never any foundation laid for any of the detective's opinions including his statement that the second shot was an echo. If the jury took the detectives inadmissible statements as fact then they believed Ms. Serrano was lying, that there was not more than one shot and relied on an incorrect statement of law that dispensed with the mens rea element of accessory liability. Defense counsel stipulated to the entire video. There is no trial strategy that justify allowing the whole, unredacted video to be played to the jury and put into evidence.

Pursuant to NMRA 11-104 defense counsel should have moved pre-trial to exclude these hearsay, irrelevant and prejudicial statements and forced the state to lay the foundation for the detective's alleged sound test and subsequent theory that the second shot was actually an echo. All of these statements were put into evidence and considered by the jury in rendering its verdict.

**B.**   **_Trial counsel provided ineffective assistance of counsel during_**
**_trial._**

Effective assistance of counsel includes the obligation to act as a meaningful adversary to the State: even if no viable defense theory is available, the Sixth Amendment still requires that counsel hold the prosecution to its heavy burden of proof beyond a reasonable doubt. **United States v. Cronic**, 466 U.S. 648, 657 n. 19. (1984) Therefore, although "strategic choices of defense counsel which are made after thorough investigation of the law and facts ...are virtually unchallengeable... a trial decision is genuinely "strategic" only when an attorney brings to bear reasonable judgment in evaluating the risks and benefits of the various choices." **Simmons v. Iowa**, 28 F.3d 1478, 1485 (8th Cir. 1994) (internal citations omitted) (Counsel was unreasonable in failing to present a diminished capacity defense because counsel lacked a complete understanding of the defense).

Even if trial counsel makes a sound and strategic choice to present an apposite defense, trial counsel may nonetheless be ineffective if he breaches his duty to present that potentially meritorious defense reasonably and competently.  Thus, a lawyer who fails to introduce evidence that demonstrates his client's factual innocence or who does not effectively try to raise a reasonable doubt about guilt renders deficient performance which undermines confidence in the outcome of the proceeding. **Avila v. Galaza**, 297 F.3d 911, 919 (9th Cir. 2002).

Defense counsel is deficient if he fails to introduce evidence or documents which can corroborate the defendant's version of the events and demonstrate his factual innocence. **Hart v. Gomez**, 174 F.3d 1067, 1070 (9th Cir. 1999).  Similarly, defense counsel may fall below an objective standard of reasonableness if he displays a singular

16

lack of preparation or actually elicits harmful information in the defense of his client. **Fisher**, 282 F.3d at 1294.

Repeated failures to object to the most blatant and prejudicial forms of hearsay and other inadmissible evidence cannot be explained away as tactical decision. The Court of Appeals has noted that when counsel's apparent shortcomings are numerous, and the prejudicial effect of these shortcomings is likely, the cumulative effect of counsel's failings may be deemed sufficient to establish a prima facie case of IAC. **State v. Crislip**, 1989-NMCA-092, 109 N.M. 351. The facts of this case establish that this is a case of cumulative deficiency, compromising the fundamental fairness of the proceedings

To the extent that trial counsel had a strategy it appears to rely exclusively on the cell phone videos of the fight and the prejudicial interrogation video. Trial counsel made no objections, introduced no evidence, called no witnesses and refused to let Ms. Serrano testify.

During opening arguments trial counsel inexplicably conceded that a crime had occurred, "... the murder of Daniel Garcia was a horrible and senseless crime." **(TR 12/8, p. 143)**. An element of accessory liability is that a crime was committed. **UJI 14-2822.** Defense counsel then conceded any argument on sufficient provocation, self-defense or defense of others stating that the "beef" between Deandre and Daniel "certainly didn't justify or warrant anything that occurred to Daniel..." **(TR 12/8, p. 143)**. He then stated that he did not "condone" Ms. Serrano's behavior. **(TR 12/8, p. 144)**.

There is no valid defense strategy to conceding much of what the state was required to prove and impugning Ms. Serrano's behaviors before the any evidence is even presented, particularly with evidence of a second gunshot, injuries to Deandre and provocation (See **UJI 14-220,** The difference between second degree murder and voluntary manslaughter is

17

sufficient provocation...) and evidence that this was a rash killing rather than a deliberate killing. See generally **State v. Garcia**, 114 N.M. 269 (N.M., 1992)(distinguishing Second from First Degree Murder and finding that Defendant did not have time to form the deliberate intent required for First Degree Murder). Deandre shot Daniel mere seconds after Daniel beat him up and injured him and while Daniel was being encouraged by a large crowd to re-initiate the fight. And, in addition to Deandre and Ms. Serrano, several witnesses told police they heard more than one gun shot.

The state admitted the cell phone videos into evidence without a proper foundation and defense made no objection. Two cell phone videos of the fight and shooting were entered into evidence by the state through witnesses that were not competent to authenticate them. See NMRA 11-901 (The requirement of authentication of or identification of as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.).

The first video was state's Exhibit 53. The state introduced the video into evidence through the testimony of Officer Arnulfo Reyes. The officer testified that he took the cell phone from another witness who was watching it. The officer was not at the scene and could not testify to the authenticity of its contents. The video was introduced into evidence via hearsay testimony. Defense counsel made no objection.

The second video was state's Exhibit 54. The state indicated that counsel agreed to its admission and trial counsel waived any objection. **TR 12/9, p. 30.** Despite trial counsel's acquiescence, the state introduced the video through Tracy Brockman, the mother of the unnamed child who actually took the video. Ms. Brockman was told by her son that the video was of the fight and shooting. **TR 12/9, p. 28.** The video came into evidence via trial

18

counsel's stipulation and hearsay testimony that said nothing of the videos authenticity. Without these videos the state would have had almost no evidence.  Although many of the witnesses called by the state were present for the incident, none testified they actually saw the shot fired.

On direct examination, state's witness Michael Ortega stated he heard two gunshots and saw someone fall after the second shot. **TR 12/9, p. 117 – 119.**  On cross examination defense counsel asked no questions about this. **TR 12/9, p. 135 – 137.**

The state called Officer Jeremy Grady who attended the autopsy in Lubbock, Texas. Through Officer Grady the state admitted into evidence autopsy photos (Exhibits 44 – 50) without objection from defense counsel.  Officer Grady testified to the nature of the injury shown in each photo without objection from defense counsel.  Defense counsel never challenged Officer Grady's medical credentials to interpret autopsy photos.

The autopsy report was written by Dr. Luisa Florez of Lubbock.  The report contains the findings of THC and alcohol in Daniel's system.  The report was stipulated to by defense counsel and read into the record by the court. **TR 12/9, p. 144.**  The alcohol and THC are described using technical terminology, "60 milligrams per deciliter for blood alcohol," "Three Delta-9-THC, 3.0 nanograms per milliliter." **TR 12/9, p. 144.**  Its likely the jurors did not know what any of this meant. Because of the stipulation no questions could be asked about the substances in Daniel's body and defense counsel failed to call an expert to explain the significance of those findings.

Defense counsel made no motion for directed verdict on the charge of First Degree Murder and appellate counsel did not raise the issue on appeal.  See arguments in Section II.

19

Defense counsel made no objections to the jury instructions despite the voluntary manslaughter instruction not containing the element of sufficient provocation. Defense counsel did not object that the instructions for the substantive crimes made no reference to the accessory instruction. See Section II below for further argument.

**C.** ***Cumulative Effect of Counsel's ineffectiveness warrants a new trial.***

The prejudicial effect of all the errors, taken together, warrants a new trial. Court "must reverse any conviction in a proceeding in which the cumulative impact of irregularities is so prejudicial to a defendant that he is deprived of her fundamental right to a fair trial. U.S. Const., amend. V, XIV; N.M. Const., art. II, § 18." ***State v. Martin***, 1984-NMSC-077, ¶ 17.

**D.** ***Trial counsel provided ineffective assistance of counsel at sentencing resulting in a hearing and sentencing that violated Petitioner's 8th Amendment right against cruel and unusual punishment.***

On March 30, 2015, after a 19 minute hearing, Ms. Serrano was sentenced to life in prison. Trial counsel presented no mitigating evidence and little argument; he merely noted her youth and that she did not shoot the decedent before asking that "some portion" of the sentence be suspended. **TR 3/30/15, p. 6.** Prior to the sentencing defense counsel filed no Sentencing Memorandum nor did he have Ms. Serrano evaluated by a psychologist or other professional who could testify about the neuroscience of adolescent development and behavior and the maturational differences between adolescents and adults. Trial counsel made no efforts to demonstrate to the court why her specific characteristics and age and characteristics of her crime were deserving of a lesser sentence than life.

The consequences of trial counsel's failure to mitigate was demonstrated when the court assigned her complete blame for the killing, "[A]lthough you didn't actually fire the shot

20

and pull the trigger you were in control of the whole situation. You had the gun. You had the, you alone had the ability to keep this from happening, and you didn't." **TR 3/30/15, p. 8.** *See* **Graham v. Florida**, 560 U.S 48, 69 ("...when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.).

It is by now well established that the 8th Amendment requires that juveniles sentenced as adults be treated treated differently than adults. The Eighth Amendments right not to be subjected to excessive sanctions "flows from the basic precept of justice that punishment for a crime should be graduated and proportioned to both the offender and the offense." **Miller v. Alabama**, 567 U.S. 460, 469 (2012)(internal citations omitted). An offender's age is relevant to the Eighth Amendment. **Id.** at 473. "[I]mposition of a State's most severe penalties on juvenile offender's cannot proceed as though they were not children." **Id.** Because juveniles have diminished capacity, "they are less deserving of the most severe punishments." **Id.** at 471, quoting **Graham**, 560 U.S. at 68.

There is now a wealth of scientific evidence relied upon by courts showing that juveniles are mentally and emotionally different than adults and that those differences matter for 8th Amendment purposes. The Miller Court summarized the "gaps" between adults and juveniles as shown by the scientific research and that the Supreme Court has found relevant and necessary in fashioning juvenile sentences that are proportional for 8th Amendment purposes: 1) children have a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk taking; 2) children are more vulnerable to negative influences and pressures including from their family and peers; they have limited control over their own environment and lack the ability to extricate

21

themselves from horrific, crime producing settings; and, 3) a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity. **Miller**, 567 U.S. at 471, see also **Ira v. Janecka**, 419 P.3d 161 (N.M., 2018)(summarizing the Miller factors). Trial counsel failed to develp an evidence on these factors. Miller reasoned that "transient rashness, proclivity for risk, and inability to assess consequences-both lessened a child's moral culpability and enhanced the prospect that, as years go by and neurological development occurs his deficiencies will be reformed. **Id.** at 472, quoting **Roper v. Simmons**, 543 U.S. 551, 570 (2005). The "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders even when they commit terrible crimes." **Miller.** 567 U.S. at 472. "So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." **Id.** at 477. The Miller court concluded that mandatory life without parole for juvenile offenders precluded the sort of individualized sentencing of juveniles that is required by the 8[th] Amendment.

Just as mandatory life without parole sentencing schemes for juveniles unconstitutionally preclude sentencers from taking into account age and its attendant circumstances, so does a defense counsel who fails to build an evidentiary record of such factors and a judge who fails to consider them. Such is the case with Ms. Serrano. Defense counsel deprived her of the opportunity to demonstrate why she was deserving of a lesser sentence than life. Without this information courts do what Ms. Serrano's court did which was to focus exclusively on punishment and treat her as if she were as culpable as an adult with all of the faculties and life experiences as an adult. While the court was not forbidden

22

from giving a sentence of life with parole, it should only have done so after considering evidence of the unique circumstances of the juvenile offender and the circumstances of the crime. See **State v. Gutierrez,** No. 33,354 (N.M., 2013)(memorandum opinion, see Rule 12-405) citing **Miller,** supra ("Since life with the possibility of parole is a lesser sentence [than life without parole], and the district court considered the unique circumstances of the case, the Child's sentence does not transgress the constitutional standard.")

Trial counsel simply did nothing to mitigate Ms. Serrano's sentencing and there is no sentencing strategy that would excuse that. Even if the court were to find that this type of mitigation is not constitutionally mandated in cases such as Ms. Serrano's, the court should still find that trial counsel's failure to do so was ineffective and fell far below what is required in cases of this type. Attached to this Amended Petition as **Exhibit G** is an Affidavit from LOPD Major Crimes Unit attorney Stephen Taylor who has handled multiple cases with serious youthful offender and youthful offender defendants, stays current with developments in the applicable law and national trends and trains other attorneys in the Millers requirements. Accompanying the Affidavit are several attachments showing the types of Sentencing Memorandums and Motions Mr. Taylor considers necessary in such cases and a court order and judgment and sentence order. See also the bench card developed by the National Counsel of Family and Juvenile Court Judges (NCFJCJ) and the National Juvenile Defender Center (NCJDC) to educate judges on the basic principles of adolescent behavior at https://njdc.info/wp-content/uploads/NJDC_Adolescent-Development_Bench-Card-1.pdf.    Mr. Taylor lays out the standard for effective assistance of counsel in cases of children facing adult sentences.

If trial counsel had just asked Ms. Serrano basic questions (Ms. Serrano states that to the best of her recollection trial counsel met with her twice before trial.) he would have learned that Ms. Serrano had suffered a great deal of trauma that led her to rely heavily, and irresponsibly, on Deandre Gonzales and why it was so difficult for her to see her way out of the situation in which she was living at the time of the crime.. As a child she witnessed severe physical abuse by her father against her mother. She stated that some of the abuse was extremely violent. She told this writer that she believes she suffers from post traumatic stress disorder because of what she witnessed, although she has never been diagnosed. She states that despite all of this she was a good student until she dropped out in the 9th grade due to an inability to cope with her parents divorce. She states that at that time she became extremely depressed and "just couldn't deal." It was at this time that she started seriously dating Deandre Gonzales, an older boy. The relationship moved quickly and she started living with him at his parent's or at her mother's house. After the divorce she became very emotionally dependent on Deandre who was often controlling, manipulative and abusive. She states that at the time she did not think much of this behavior because it was so mild compared to her own father's. Ms. Serrano states that while on release during the various stages of this case that she babysat almost daily for her cousin's infant child showing that she is capable of responsible behavior. Her cousin has since been murdered. In prison she has done well indicating she is susceptible to reformation and maturation. She states that she works in the kitchen and takes advantage of every educational opportunity available.

Instead, all the court had to consider in dictating the sentence was the trial and the presentence report required by NMSA 31-18-15.3. **(Exhibit H – PSR).** Trial counsel should have objected to the PSR and proceeding to sentencing with it. The presentence report itself

24

is completely lacking in the information contained in the Miller factors and does not even satisfy the policies of the New Mexico Corrections Department regarding the investigation and promulgation of presentence reports. As such the court should find that it is not a presentence report under 31-18-15.3 and order a new sentencing. "[A] trial court has no jurisdiction to impose a sentence accept in accordance with the law..." **State v. Mares**, 119 N.M. 48, 50 (1994). Preparation of and submission of a presentence report is is a mandatory precedent to a child's sentencing as a serious youthful offender. **State v. Gutierrez**, 2011-NMSC-024, ¶ 66. Ms. Serrano asks the court to find that the presentence report in her case is not sufficient to satisfy the requirement under NMSA 31-18.15.3(E).

The report received by the court is a presentence report in name only. (See Exhibt – Presentence Report). New Mexico Corrections Department (NMCD) policy CD-051700 (https://cd.nm.gov/wp-content/uploads/2019/06/CD-051700.pdf) defines a pre-sentence report as "A report prepared by the PPD personnel for the purpose of assisting the courts in the determination of a sentence by providing the courts with background information regarding the defendant." CD-051700 goes on to list all of the policies required to be followed in the production of presentence reports. The policies reference the Performance Based Standards for Adult Probation and Parole Field Services (APPFS) promulgated by the American Correctional Association Standards Committee. https://www.aca.org/aca_prod_imis/docs/Standards%20and %20Accreditation/sac_August_2008.pdf.

Policy 1 contained in CD-051700, states, in relevant part, "In order to assist the court in selecting the most appropriate sentencing alternative and correctional disposition for an offender, PPD staff will prepare pre-sentence reports containing timely, relevant, and

25

accurate data at the request of the courts; subject to this primary purpose, the report is also prepared in a manner to serve the needs of any correctional institution or field agency which may receive the offender[...]. [4-APPFS-1B-03] " The APPFS standard referenced in the policy states, "At a minimum, pre-sentence investigations typically include the following information: victim(s) statement if given by the victim(s); defendant's prior record, educational background and family history; employment; health; accurate restitution information; circumstances of the instant offense...". Policy 10 contained in CD-051700 states, "Probation officers shall consider sentencing alternatives that match offender characteristics and needs and balance those needs with the primary mission of public safety."

The procedures section of CD-051700 in point 5 states,

PSR's are prepared for the courts. Information expected by the Courts may vary among the judicial districts based on the needs of the courts in those districts. However, there is a core of information that is relevant regardless of the district, and which will be included in the standard format of all PSR's. Examples of this information are listed in CATEGORY A below. CATEGORY A: Name and aliases, Current physical address and mailing address, Sex, Age, DOB, Height, Weight, Ethnicity, Tattoos and/or scars, Place of Birth, Judge, Case #, District Attorney, Defense Attorney, Co-defendants, Probation Officer, Date of Offense, Date of Arrest, Where Arrested, Arresting Agency, Present Offense and Penalty, Date Convicted, Circumstances of Offense, Victim Impact Statement, Defendant's Version of Offense, Prior Criminal Record, Spouse and Dependants, Education Level, Employment History, Financial Assets and Liabilities, Substance Abuse History, Mental Health History, and Self-admitted or Verified Gang Affiliation, recommendations for fines, restitution, and family support, and their amount(s) to the court.

Point 9 of CD-051700 lays out certain guidelines for the investigation and preparation of the report. Section b requires a synopsis of the offense that "should make clear the "who", "what", and "when" of the offense, and should be free of editorializing or conjecture on the part of the PPO writing the report. It should make clear the actions of the offender during the crime, the actions of any co-defendants, and should clearly illustrate the elements of the offense of which the offender was convicted." This was not done.

26

In part, Section e addresses "any history of addiction or substance abuse on the part of the offender. This may include any history volunteered by the offender, but should also include information gathered from other sources. The effects of controlled substance or alcohol use in the present offense should be addressed, as well as any prior, current, or proposed treatment." None of this is contained in Ms. Serrano's report.

Section f addresses "any history of mental illness or emotional instability, and the offender's current status. The offender's own assessment of his condition should be cited, but should be differentiated from any professional diagnoses. The role of the offender's mental health in the current offense should be addressed, as well as any prior, current, or proposed treatment. Any history of suicide attempts or preoccupation with suicide should be documented." Only Ms. Serrano's report of her mental history is contained in the report.

The Education/Employment section should "address the nature of the offender's present employment, income, and vocational skills. It should also explore his prior employment history for the past five years, and should attempt to verify as much of that history as possible." Ms. Serrano's vocational skills were not addressed and nothing she stated was verified.

The social family section "should address the current marital and family status, and should address any established support obligations. This section should include an accounting of the offender's formative years, and observation of any dysfunction or strengths within the family structure. The nature of familial relationships as they relate to the current offense should be addressed." Ms. Serrano's report contains only a cursory description of her family structure and a statement from her about her childhood.

27

The summary/evaluation section "should be an attempt to bring together all of the data revealed during the investigation, and to summarize it in an analysis of its relationship to understanding the nature of the offender and the present offense. The PPO should evaluate the defendant by outlining factors in the defendant's background which seem to explain his/her involvement in criminal activity, and what reasonably can be done about it; first, considering public safety and secondly, the defendant's potential for rehabilitation. The PPO should consider innovative sentencing alternatives in all cases in which incarceration is not clearly imperative for reasons of immediate public safety." The guidelines for this section state that the analysis should address, in part, "The extent or degree of threat to the public posed by the individual."; "The extent or degree of an individual's commitment to criminal or delinquent tendencies and the nature of his/her response to any earlier correctional programs."; "The kind of personal stability and responsibility evidenced in his/her employment record, residential patterns, and family support history."; "The kind of apparent personal deficiencies, including education and vocational training needs." and "The personal and psychological characteristics of the offender that determine how he/she perceives the world and his/her relationship to it." "When probation is not prohibited by statute, a potential supervision plan is developed during the pre-sentence investigation and included as part of the PSR." "If incarceration is recommended, an alternative recommendation shall be made, if applicable." Ms. Serrano's report contains none of this information or analysis.

What is clear from Ms. Serrano's presentence report is that in the investigation and production of the report Adult Parole and Probation did not even follow its own policies. The report is so lacking in information as to be of no use to a sentencer and in fact the sentencing court never referenced its contents. The court should find the report is so

28

inadequate as to be tantamount to no report and order a new sentencing. See **Gutierrez**, 2011-NMSC at ¶ 65, citing **State v. Jose S.**, 2007-NMSC-146 (Child cannot show prejudice or that that the report would be favorable since it was never created. "This inability to demonstrate prejudice is itself prejudicial to the Child.").

## II.   PETITIONER'S CRIMINAL CONVICTIONS WERE OBTAINED IN VIOLATION OF HIS STATE AND FEDERAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.

Ms. Serrano's criminal convictions were obtained in violation of her state and federal constitutional rights to due process and a fair trial.  As a result, a fundamental error has occurred because Ms. Serrano has been convicted of a crime which she did not commit. See **Montoya v. Ulibarri**, 2007-NMSC-035, ¶ 23.

Article II, section 18 of the New Mexico Constitution prohibits depriving a person of life or liberty without due process of law.  "Fundamental fairness is intrinsic within the concept of the due process that is provided by the New Mexico Constitution." **Id**. ¶ 23, citing **State v. Vallejos**, 1997-NMSC-040, ¶ 17.

Nothing is more contrary to a contemporary standard of decency, or more shocking to the conscience of fair-minded people, than for an innocent person to be convicted of a crime he did not commit.  "The conviction [and] incarceration... of an innocent person violates all notions of fundamental fairness implicit within the due process provisions of [the New Mexico] constitution." **Id**. ¶ 23.

### A.   *There was insufficient evidence of a First Degree Murder.*

In **State v. Garcia**, 114 N.M. 269 (N.M., 1992), the Supreme Court endeavored to distinguish First from Second degree murder because, "Without guidance on the types of evidence that will support deliberate murder, virtually all intentional killings will result in

29

jury instructions on first degree murder and the jury will be left to apply its own conception of what deliberate intention means." **Id**, at 272 quoting from Leo Romero, A Critique of the Willful, Deliberate, and Premeditated Formula for Distinguishing Between First and Second Degree Murder in New Mexico, 18 N.M.L.Rev. 73 (1988).

The defendant in **Garcia** stabbed and killed the victim and was later convicted of First Degree Murder.  The Supreme Court found the evidence only supported a Second Degree murder.  In that case the defendant and the victim drank and argued throughout the day over the defendant having previously kicked the victim's girlfriend.  At one point the defendant said, "Remove [the victim] away from me or you're not going to be seeing him for the rest of the day." After the girlfriend had not seen the victim for several minutes she went to look for him but was held back by another man for several more minutes.  When she finally found the victim defendant was repeatedly stabbing him and his face was cut up.  The defendant then told the girlfriend, "I'm going to mess you up like I messed up your boyfriend. I'll be seeing you soon," and "No, your day will be coming soon." Another witness saw the two men arguing and punching each other just before the stabbing.  The defendant then fled and when later approached by police lied about his identity.  When the defendant later surrendered he stated, "I did it. I did it. I'm not ashamed to admit it. I told my brother I did him and I'd do him again." The Supreme Court found this was insufficient evidence of a "willful, deliberate and premeditated" intention to kill.

The Court stated, "Clearly, when the legislature prescribed such serious penalties for willful, deliberate and premeditated killing, it did not mean to lump within this classification all other killings, even those which may in some sense be intentional but which lack the characteristics of deliberation and premeditation." **Id**, at 272.  The Court found the evidence

30

supported only an intentional killing committed on "a mere unconsidered and rash impulse." **Id.**, at 273. In fact, the Court found the evidence altogether lacking for any inference of deliberation; there was no evidence that the stabbing was as a result of careful thought, that the defendant weighed the considerations for and against the act, or that he weighed and considered the question of killing and his reasons for and against this choice. **Id.**, at 274.

There is even less evidence of a deliberate intention to kill in Ms. Serano's case than in **Garcia**. It was not even Ms. Serrano who killed despite having the opportunity to do so while she held the gun. The evidence in the light most favorable to the state is that Deandre shot and killed Daniel after a brief fight that Deandre lost that resulted in a cut to his head; that after losing the fight and before retrieving the pistol, Daniel's friends agressively encouraged him to go after Deandre again; that when Deandre reached for the gun Ms. Serrano handed it to him saying, "Here it is," and that all of this occurred in a matter of seconds.

The state argued on closing that by fleeing the scene and concealing themselves that Ms. Serrano and Deandre had shown their guilt. But the **Garcia** Court found similar evidence (fleeing and concealing identity) did not "give rise to an inference as to his state of mind before the stabbing." at 275. The defendant's statement in **Garcia** that the others should remove the victim or that they weren't going to see the victim the rest of the day only suggested an intention to fight. **Id,** The statement to the victim's girlfriend that he was going to "mess her up" like he did the victim did not indicate an intention to kill. **Id.** That being the case, Ms. Serrano's statement, "Here it is," indicates nothing more than her intent to return the pistol to Deandre. The state claimed (Habeas counsel could not locate this statement on any video.) that Ms. Serrano could be heard saying something like, "You wound

31

up getting shot." Assuming arguendo this is correct, it does not indicate a deliberate intent to kill formed prior to the shooting.

The Garcia Court found the strongest evidence of deliberate intent was the defendant's statement, "I told my brother I did him and I'd do him again." **Garcia**, 114 N.M at 275.  But the Court found the statement did not show the defendant deliberated and intended to kill his victim before the stabbing. **Id.**  Based on the evidence adduced at trial in the light most favorable to the state, Deandre's and Ms. Serrano's actions could not lead to a reasonable inference that they deliberated and intended to kill Daniel and that the killing was the result of careful thought, that the defendants weighed the considerations for and against the act, or that they weighed and considered the question of killing and the reasons for and against this choice anymore than the facts in **Garcia** did.  Certainly Ms. Serrano's act of handing the gun to Deandre and stating "Here it is," cannot support a reasonable inference that she deliberated and intended for Deandre to kill Daniel.  It merely shows her returning property to Deandre, property that only seconds before he had given her to hold. After all, whether Deandre fired, or not, he would likely have taken his things back.  "[E]vidence equally consistent with two hypotheses tends to prove neither." **Id.**, quoting **Herron v. State**, 111 N.M. 357, 362 (1991).

Furthermore, if such evidence is sufficient to support the charge it would essentially create a duty on Ms. Serrano to foresee and prevent the crime or face a conviction as an accessory even where she did not have the requisite mens rea and where no such duty exists in the law. See W. LaFave & A. Scott, Criminal Law Section 26, at 183 (1973)(For criminal liability to be based on a failure to act, there must be a duty to act—a legal duty and not

32

simply a moral duty. One has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself.)

Neither trial counsel nor appellate counsel argued sufficiency of the evidence regarding the mens rea element of First Degree Murder. Ms. Serrano was prejudiced by this error since, based on the **Garcia** distinction and analysis and the evidence adduced at trial, she was likely to prevail. And had she prevailed, she would no longer have been a "serious youthful offender" pursuant to NMSA 32A-2-3(H) and not automatically sentenced as an adult pursuant to NMSA 31-18-15.3.

Defense counsel's only motion for a directed verdict concerned the sufficiency of the evidence for accessory liability. **(TR 12/9, p. 228).** Despite this claim being preserved appellate counsel inexplicably failed to raise the it on appeal. "The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval. Mere presence [...] and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient." **State v. Salazar**, 431 P.2d 62, 64 (N.M., 1967). An accessory must share the criminal intent of the principal. **Id.**

The evidence in the light most favorable to the state shows Deandre handing the pistol to Ms. Serrano before the fight and once the fight is over taking it back while Ms. Serrano states, "Here it is." Since the gun was Deandre's and he had just given it to Ms. Serrano, taking it back indicated little more than that he wanted his pistol back. Whether or not he fired the gun, he would have taken the gun back so, without more, there is no way to infer

33

that Ms. Serrano shared Deandre's intent.  Ms. Serrano, in fact, had no right to Deandre's property once he indicated he wanted it back.

Without Deandre in some way indicating his intent to shoot or Ms. Serrano indicating she wanted him to, the only reasonable inference from this evidence is that Ms. Serrano was returning Deandre's pistol to him.  There is a complete lack of evidence that Ms. Serrano knew or even had any way of knowing what Deandre's intentions were when he retrieved the gun from her or at what point Deandre formed his intent.  The video shows Deandre reaching for the gun and Ms. Serrano indicating she had it.

**B.**   ***Issues With the Jury Instructions***

Trial counsel did not object to the jury instructions and the issue was not raised on appeal.  The fundamental error doctrine stands as "[a]n exception to the general rule barring review of questions not properly preserved below[.]"  **State v. Osborne**, 1991-NMSC-032, ¶ 38 (internal quotation marks and citation omitted).  "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." **State v. Sutphin**, 2007-NMSC-045, ¶ 16.  When reviewing a jury instruction for unpreserved, fundamental error, the Court begins with the same inquiry as for preserved, reversible error: "whether a reasonable juror would have been confused or misdirected by the jury instruction." See **Barber**,2004-NMSC at ¶ 19. If the answer is yes, "[f]undamental-error analysis then requires a higher level of scrutiny." **Id**. "If we find error, our obligation is to review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." **Id**."[F]ailure to instruct the jury on an essential

34

element, as opposed to a definition, ordinarily is fundamental error when the defendant fails to object or offer a curative instruction."**Id.** at ¶ 20.

The instruction for Voluntary Manslaughter (UJI 14-220) used at trial completely omitted element 3: The defendant acted as a result of sufficient provocation. The instruction was basically the instruction for Second Degree Murder without Voluntary Manslaughter as a lesser included offense (UJI 14-211). The jury was not instructed on an essential element of voluntary manslaughter and counsel failed to object and the obvious error was not raised on appeal.  Without the jury receiving the sufficient provocation element the jury was never given the opportunity to actually consider voluntary manslaughter despite the court and the parties clearly intending for it to do just that.

The accessory instruction (UJI 14-2822) and the homicide instructions are inherently contradictory and confusing.  UJI 14-2822, the accessory instruction, states "The defendant may be found guilty of a crime even though he himself *did not do the acts* constituting the crime, if the state proves to your satisfaction beyond a reasonable doubt" that the defendant intended the crime to be committed, that it was committed and defendant helped, encouraged, or caused the crime to be committed. (emphasis added). The instructions for First Degree Murder (UJI 14-201) Second Degree Murder (UJI 14-210), Voluntary Manslaughter (UJI 14-220) and Involuntary Manslaughter (UJI 14-231) all require that to find the defendant guilty the jury must find that the defendant killed or, as is the case with voluntary manslaughter, caused the death of the victim.

Since the state was proceeding on an accessory theory the jury instructions for the actual crimes should have incorporated the accessory language in order to direct the jury to the what the law required when assessing the evidence in light of the reasonable doubt

35

standard.  As it was given, without reference to any specific crime, the bare accessory instruction could have misled the jury about the mens rea elements of the substantive crimes and led them to convict on an accessory theory because they believed the defendant intended some or any crime to occur since it is not explicitly tied to any specific crime.  Or, it may have led the jury to believe that if it believed Ms. Serrano was an accessory they could ignore the mens rea requirement of the substantive crime before convicting her of one of them.  Or, since the substantive instructions do not reference the accessory instruction, the jury may have found, despite no evidence, that the defendant actually did the killing.  See **Jackson v. Virginia**, 443 U.S. 307 (1979)(Noting that even "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.") That is entirely possible since the instructions for the substantive crimes instructed them to consider just that.  The jury cannot be expected to ignore the plain meaning of the words they are told to faithfully follow.  Its as if the instructions created an entirely separate crime of accessory unrelated to the other crimes they were instructed to consider.

The defendant in **State v. Varela**, 1999-NMSC-45, made a somewhat similar argument.  In that case the jury was instructed on accessory, felony murder and depraved mind murder which incorporated the accessory language of "The defendant ... helped, encouraged or caused.", and Second Degree Murder which did not contain the helped, encouraged or caused language. **Id.** at ¶ 44.  The defendant argued that omitting that language from the second degree instruction may have led the jury to believe there was a higher level of culpability for felony or depraved mind murder than for second degree. **Id.** The Court disagreed because the second degree instruction stated, "For you to find defendant

36

guilty *as an accessory* to Second Degree Murder as an included offense of Count 1, *even though the defendant did not commit the murder...*" and the jury was given the accessory instruction separately.  **Id.** (emphasis added).  There was no such language included in the instructions for the substantive crimes in this case and those instructions in no way referenced the accessory instruction or direct the jury to read them together.   Because of ambiguous and contradictory language of the jury instructions, it cannot be said that the jury was adequately instructed on the law of the case or that the jury ignored the plain language of the instructions before them.  Such a result would shock the conscience of the court.

### Conclusion/Remedy

Ms. Serrano seeks to set aside her order of confinement.  Habeas counsel for Petitioner requests an order from the Court directing Respondent to respond within 90 days pursuant to NMRA Rule 5-802.

WHEREFORE, Petitioner respectfully requests that this Court order the State to respond to this petition for a writ of habeas corpus and set this matter for an evidentiary hearing.

Respectfully submitted,

Jason B. Wheeless, Esq.
Attorney for Petitioner
1703 Sudderth Dr. #454
Ruidoso, NM 88345
(505) 261-2230

I hereby certify that a true and correct copy of the
foregoing was sent to Counsel for Respondent upon filing.

37

Hasler
07/08/2021
**US POSTAGE $008.55°**
ZIP 87020
011E11678586

PRIORITY MAIL

Label 400 Jan. 2013
7690-16-000-7948

UNITED STATES
POSTAL SERVICE®

**USPS TRACKING #**

9114 9022 0078 9360 0760 08

Santana Serrano #83002
P.O. Drawer 260
Grants NM, 87020

United States District Court
District of NM
333 lomas Blvd. N.W
Suite 270
Albq. N.M, 87102

**RECEIVED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUL 0 9 2021

MITCHELL R. ELFERS
CLERK